**Dr. Willis R. FOSTER, Appellant,**

v.

**S. Dillon RIPLEY, individually and in his capacity as Secretary of Smithsonian Institution et al.**

**No. 79–2107.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1980.

Decided April 7, 1981.

Cameron F. Kerry, Washington, D. C., with whom William J. Kolasky, Jr., Richard F. Goodstein and Arthur B. Spitzer, Washington, D. C., were on brief, for appellant.

Constance L. Belfiore, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Dennis A. Dutterer, Asst. U. S. Atty., Washington, D. C., were on brief, for appellees.

Before LUMBARD *, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, ROBB and MIKVA, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge LUMBARD.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

LUMBARD, Circuit Judge:

Plaintiff Willis R. Foster appeals from the order of the District Court for the District of Columbia, Harold H. Greene, J., granting summary judgment against the plaintiff on his claims that his dismissal from the position of Vice President for Professional Services of the Smithsonian Science Information Exchange, Inc. (SSIE) violated his First and Fifth Amendment rights.[1] We now affirm.

The SSIE is a clearinghouse for information on developments in medical and scientific research. Its purpose is to facilitate the planning, management and coordination of such research among federal agencies and private institutions. The SSIE evolved from an information exchange created by an agreement among a number of government agencies. Although originally operated under the auspices of the National Science Foundation, administrative responsibility for the SSIE was transferred to the Smithsonian Institution in 1953. In 1971, the SSIE was incorporated as a nonprofit corporation under the laws of the District of Columbia.

The SSIE generates its operating revenues by means of "user fees" charged to its "clients"—various government agencies and private institutions. Over 90% of its income derives from federal appropriations or federal contracts. It is held out to the public, as its present name implies, as part of the Smithsonian Institution, which supplies the SSIE's accounting, personnel, payroll, audit, legal, fiscal and procurement services for a contractual fee, and which holds a majority of seats on the SSIE's board of directors.

The particular events which give rise to this suit involve the dismissal of plaintiff Foster in 1976. By that time, Foster, who had served with the SSIE and its various predecessors since 1959, had become Vice-President in charge of the professional services division. He also supervised the SSIE's Current Cancer Research Project Analysis Center (CCRESPAC), a separate unit funded by the National Cancer Institute (NCI) as a component of NCI's International Cancer Research Data Bank Program (ICRDB). In 1975 and 1976, defendant David F. Hersey, President of the SSIE, developed plans for reorganizing the professional services division. The proposed changes would have reduced Foster's control and influence at the SSIE by removing eight SSIE branches from Foster's control.

Foster opposed the plan. In particular, he objected to the removal of two branches from his control, since he believed that his position as supervisor of CCRESPAC, in which he was to continue, required control of those branches. In early February of 1976, Foster twice met with Hersey and voiced his strenuous opposition to the reorganization. He said that if the plans were implemented he would have to resign and others might do so as well. He also stated that if anyone at NCI asked his opinion of the matter, he would voice his objections. Hersey replied that this was an internal matter and expressed his disagreement over the potential effects on the CCRESPAC program.

After the second meeting, Hersey spoke with Dr. John Schneider, Director of ICRDB, and assured him that the proposed reorganization would not affect the quality of the SSIE's services. Hersey also informed Schneider of Foster's disagreement and threat of resignation. The next day, Foster called Schneider[2] and told him of his opposition to the reorganization. They decided that Schneider should write a letter to Foster, requesting Foster's opinion of the plans; they hoped their correspondence would influence Hersey. Foster also ex-

---

1. Named as defendants are S. Dillon Ripley, Secretary of the Smithsonian Institute, Dr. David Challinor, Assistant Secretary for Science of the Smithsonian, Alan Ullberg, Associate General Counsel of the Smithsonian, and Dr. David Hersey, President of the SSIE. All of the defendants are members of the board of directors of the SSIE.

2. Although initially Foster and Schneider stated that Schneider phoned Foster, Schneider later informed the U.S. Attorney's office that he and Foster had agreed to this false version of the facts because they thought it would bolster Foster's case.

pressed his opposition to the reorganization to several of the SSIE's bureau chiefs.

When told of Foster's calls to other SSIE officials, Hersey called a meeting and outlined to all involved the proposed reorganization. Shortly thereafter, Foster placed on Hersey's desk a copy of the letter from Schneider requesting Foster's opinion of the reorganization and a copy of Foster's response. Foster's letter stated that as a result of the reorganization he could not assure the continued quality of CCRESPAC services. Foster's letter again conveyed his intention to resign if his views were not heeded and his belief that others would join him. Hersey thought the letter forecasted "doom" for the CCRESPAC project, thereby suggesting default on contractual obligations and jeopardizing the SSIE's relationship with an important client.

Hersey immediately contacted the Director of the Office of Internal Affairs of NCI, Dr. O'Conor (who was Schneider's superior) and informed him of the reorganization, assuring him that the quality of the SSIE's services would not be adversely affected. O'Conor was apparently surprised that Schneider had involved himself in internal SSIE affairs. Hersey also spoke with defendant David Challinor, an Assistant Secretary of the Smithsonian and the Chairman of the board of directors of the SSIE, and defendant Alan Ullberg, an Associate General Counsel of the Smithsonian and a director of the SSIE.

On February 23, 1976, Hersey met with Foster and told Foster that his actions were contrary to the interests of the SSIE and constituted a breach of fiduciary responsibility. Hersey stated that Foster could either execute his threatened resignation or be fired for cause. Hersey placed the alternatives in writing. Foster refused to resign. On February 27, Foster was given notice that his employment would be terminated as of March 31.

The SSIE board, at a meeting held on February 26, clarified the authority of the President to dismiss employees and appointed an Appeals Committee, although no specific action was taken on Foster's discharge.

On the same date, Challinor met with Foster, informed him of the appeals process and assured him of a fair hearing. After receiving formal notice of discharge on February 27, Foster appealed Hersey's action to the SSIE board of directors. He was advised by Ullberg to obtain counsel and did so.

Foster submitted a large amount of written material to the board. Challinor then informed Foster that the documents were being transferred to an Appeals Committee, comprised of three officials. Foster registered some reservations about two of the officials' connections to Hersey. Challinor considered the objections but decided that the men would not be prejudiced against Foster. Challinor also charged the Committee with the task of deciding whether Foster's removal was "based upon a 'reasonable' determination by Dr. Hersey, as opposed to an 'arbitrary and capricious' determination that Dr. Foster's conduct amounted to 'misconduct, delinquencies, inefficiencies' as those terms are used in Smithsonian Institution Office Memorandum 751, which is used by SSIE."

A hearing was scheduled and then postponed at Foster's request. He declined to attend a second hearing, stating that the case could be considered on the written submissions. After considering the written materials, the Appeals Committee unanimously agreed that Foster's dismissal was "on just grounds and appropriate." Shortly thereafter, the full board adopted the decision of the Appeals Committee. Foster then brought this action, seeking reinstatement, back pay and damages. He alleged that his discharge violated his First Amendment rights and deprived him of liberty and property without due process of law. He also alleged that since his discharge he has been unable to obtain a permanent position—within his specialty—similar to his former position.

In an unpublished memorandum opinion, the district court granted the defendants' motion for summary judgment. Judge Greene ruled first that the SSIE should be considered a federal instrumentality due to

the "pervasive involvement by the government in the operation of the Exchange." Applying the "pragmatic test" of *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), Judge Greene concluded that Foster's dismissal constituted "state action," making applicable the strictures of the First and Fifth Amendments.

On the merits, however, Judge Greene rejected both First and Fifth Amendment claims. As for the Fifth Amendment claim, the Judge held that Foster did not have any "legitimate expectation [of a] property interest in his employment," since the Smithsonian Memorandum which governed SSIE employment rights stated that "appointments may be terminated at any time." Moreover, the court noted that Foster was provided with an opportunity for a hearing and documents and affidavits were submitted to an appeals committee. The court held that Foster received "all the process that was due." Finally, on Foster's First Amendment claim, the court noted that, unlike other cases in which discharged employees brought such claims, Foster was neither "engaged in debating matters of public importance or commenting on issues of public concern." Instead, Foster was "simply engaged in a bureaucratic tangle with his superior and when, in attempting to protect his own interests, he overstepped the appropriate bounds, he was terminated." The court concluded that Foster's conduct was not protected by the First Amendment. Therefore, the court granted summary judgment for the defendants.

## I. STATE ACTION

■ Since the restrictions imposed by the First and Fifth Amendments are applicable only to the instrumentalities of government, an initial issue is whether the SSIE's dismissal of Foster constituted state action. Defendants assert that the Supreme Court's decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and subsequent cases established a two-part test for determining whether an entity's actions are state action: first, the entity must be endowed with governmental powers such that it performs a state function or exercises state authority, and 2) there must be a close nexus between the government and the challenged action such that the action "may be fairly treated as that of the state itself." Defendants point out that the SSIE is a nonprofit institution incorporated under the laws of the District of Columbia, and that the SSIE independently determines its personnel policies. Finally, the defendants also draw our attention to cases holding that mere receipt of federal funding does not convert actions of institutions such as private universities into state actions. *See, e. g., Greenya v. George Washington University*, 512 F.2d 556 (D.C. Cir.), *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975); *Spark v. Catholic University*, 510 F.2d 1277 (D.C.Cir.1975).

We are not persuaded by these arguments, but instead agree with the district court that Foster's dismissal constituted state action. The district court relied upon *Burton, supra*, in which the Supreme Court stated that in each case presenting the question of state action, courts must proceed by "sifting facts and weighing circumstances." *Id.* 365 U.S. at 722, 81 S.Ct. at 860. In *Burton*, the Court held that racially discriminatory policies of a restaurant which leased space in a public parking facility constituted state action. The Court in *Jackson, supra*, in holding that a state-regulated utility's termination of services did not constitute state action, noted the continuing vitality of *Burton* as standing for the proposition that state action will be found where the activities of the government and the entity in question are so intertwined that a "symbiotic relationship" exists between them. *Jackson, supra*, 419 U.S. at 357, 95 S.Ct. at 456. In subsequent cases, the circuit courts have agreed that *Jackson* did not overrule this principle established in *Burton*. *See, e. g., Chalfant v. Wilmington Institute*, 574 F.2d 739 (3rd Cir. 1978) (en banc); *Downs v. Sawtelle*, 574 F.2d 1 (1st Cir. 1978), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); *Braden v. University of Pittsburgh*, 552 F.2d 948 (3rd Cir. 1977) (en banc); *Holod-*

*nak v. Avco Corp.,* 514 F.2d 285 (2d Cir.), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975).

We believe here that the government's involvement in the operation of the SSIE is sufficient to constitute the type of symbiotic relationship found in *Burton.* As the district court found, the majority of the SSIE's board of directors are Smithsonian officials,[3] the SSIE continues to serve primarily as a clearinghouse for research undertaken or funded by federal agencies, over 90 percent of the SSIE's budget originates from federal appropriations or contracts, the SSIE is treated by the Smithsonian and held out to the public as one of its bureaus, and the Smithsonian handles its accounting, personnel, payroll, audit, legal, fiscal, and procurement services and its requests to the Congress for appropriations. Indeed, the SSIE is close in character to a federal agency or department; it is essentially an operating branch of the federal government.

We find unpersuasive the cases cited by appellants holding that the mere receipt of federal funds is insufficient to convert a private institution into a public one. Unlike the private universities or clubs in those cases, *see, e. g., Irvis v. Moose Lodge No. 107,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Greenya, supra; Spark, supra,* the SSIE has been deeply involved with the government from its inception. It was originally founded by the agreement of several government agencies, and the vast majority of its funds have always originated in congressional appropriations. Rather than being a case of a clearly private institution which receives some sup-

port from the government, this is a case of an institution which has always had a pervasive public character.

Finally, we note that even under the more demanding standards of *Jackson* and the cases involving private universities, the action here qualifies as state action. The fact that the majority of the members of the SSIE's board of directors are Smithsonian officials in itself is sufficient to find that the government exercises control over the actions of the SSIE. *See, e. g., Spark v. Catholic University, supra* (to demonstrate state action, must be showing of government control of actions of private party); *Jackson v. Statler Foundation,* 496 F.2d 623, 634–35 (2d Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975) (four of seven foundation board members appointed by state officials sufficient to find actions of foundation constituted state action). . Moreover, it is difficult to ignore the Smithsonian's involvement in the dismissal of Foster, who was notified of his dismissal in a letter on Smithsonian stationery which arrived in a government franked envelope, who was told that his conduct had been prejudicial to the "interests of the Smithsonian Institution," and whose discharge was approved by a board of directors the majority of whom were Smithsonian officials. We therefore agree with the district court's ruling that the SSIE's dismissal of Foster constituted state action.[4]

## II.  FIRST AMENDMENT CLAIM

We also agree with the district court that Foster's dismissal did not violate his rights under the First or Fifth Amend-

---

**3.**  As noted below, this fact in itself has been found in other cases to be sufficient to establish state action.

**4.**  We also take note of the fact that, according to a notice in the Federal Register, 45 Fed.Reg. 9310 (Feb. 12, 1980), as of Oct. 1, 1980, the SSIE is to be incorporated into the Department of Commerce.  The move followed a series of recommendations for altering the structure of the SSIE, including a General Accounting Office Report which noted that dissolution of the SSIE's corporate form would increase fiscal accountability to Congress.  The notice in the

Federal Register suggests that the transfer to the Department of Commerce was undertaken after the Director of the Office of Management and Budget and the Office of Science and Technology Policy determined that merger of the SSIE with the Commerce Department's National Technical Information Service would create a "comprehensive central index of on-going research projects."

The SSIE's governmental status has thus, for the future, been settled.  Moreover, the events surrounding the transfer offer strong evidence of the federal government's control of the SSIE.

ments. Under *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), to demonstrate a violation of First Amendment rights, a government employee allegedly discharged as a result of certain speech or activity must first demonstrate that the conduct was constitutionally protected. Once such a showing is made, the burden is on the employer to demonstrate that it would have reached the same decision as to employment in the absence of the protected conduct. The Court noted in *Mt. Healthy:*

> That question of whether the speech of a government employee is constitutionally protected expression necessarily entails striking "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

429 U.S. at 284, 97 S.Ct. at 574. In this case, the district court held that Foster's actions did not constitute constitutionally protected conduct because Foster's situation was quite dissimilar from those in which protected conduct has been found. The court distinguished *Pickering, supra,* as involving a public employee commenting upon matters of public concern and distinguished Foster's situation from that of a government "whistleblower" who exposes corruption among public officials, as in *Porter v. Califano,* 592 F.2d 770 (5th Cir. 1979). Instead, the court found that in this case, the plaintiff's actions were taken as part of a "bureaucratic tangle" in which the plaintiff was attempting to protect his personal interests.

■ Foster argues on appeal that the district court erred in holding that his conduct was not protected. He argues first that the district court's holding amounted to an impermissible content-based denial of free speech protection, since the district court improperly took into account the degree of public interest and the mere fact of Foster's personal interest, and thereby failed to undertake the balancing required by *Pickering* and *Mt. Healthy.* In effect, Foster argues that all speech by government employees relating to their jobs is "protected," but that the right of the employee to speak out must then be balanced against the employer's interest in efficiency, as required by *Pickering.*

We believe that Foster misreads the holding of the district court. As the quoted passage from *Mt. Healthy* makes clear, conduct of government employees is "protected" when, *after* balancing the interests of employee and employer, it is concluded that the employee's interest in speech outweighs the government's interest as an employer in efficient management. Under *Pickering* and *Mt. Healthy,* one factor relevant in weighing the side of the balance favoring the employee is the interest served by his speech. That interest is entitled to more weight when the employee is commenting on a matter of general interest or acting as a whistleblower exposing corruption among public officials rather than merely trying to advance his own interests as an employee, interests that would be no different if his employer were not the government. Thus, it was quite proper for the district court, in considering whether Foster's conduct was "protected," to consider whether Foster was commenting upon matters of public interest or was acting to further his own interests. Indeed, *Pickering* and *Mt. Healthy* expressly require such an inquiry.

■ Foster also argues that, even so, the district court erred by failing to specify in detail, on the other side of the *Pickering* balance, the interests of the government as an employer in punishing Foster's conduct. Admittedly, this court and others have made clear that, in carrying out the balancing required by *Pickering,* government efficiency interests should be closely examined, and summary judgment in such cases is often disapproved. *See, e. g., Hanson v. Hoffman,* 628 F.2d 42 (D.C.Cir.1980); *Tygrett v. Barry,* 627 F.2d 1279 (D.C.Cir.1980); *Porter v. Califano, supra.* Nevertheless, in this case, we believe that the balancing of

interests so clearly weighed against Foster that summary judgment on the issue was appropriate.

As the district court noted, Foster was engaged in a bureaucratic fight over administrative control of certain SSIE bureaus. We agree with the district court's characterization of the case as essentially involving a mere power struggle between an employee and his superior, in which the employee attempted to subvert his superior's actions by attacking them through external rather than internal channels. Foster certainly has a First Amendment interest in speaking out on matters of public interest. The internal reorganization of the SSIE is conceivably a matter of public interest. On the other side of the balance, however, it is clear that Foster's action could have caused considerable harm to the interests of the SSIE. Foster's letter to Schneider in effect stated that the SSIE would be incapable of providing high quality services to an important client of the SSIE.[5] Such a comment was a direct attack on his superior Hersey and others and made it impossible for Foster to continue to perform effectively at the SSIE. This was clearly a case in which an employee's working relationships and effectiveness were completely disrupted by the purportedly protected conduct.

Moreover, like the district court, we find Foster's case quite distinguishable from others in which conduct was held protected or in which remands were required for detailed findings of fact. Unlike the schoolteacher whose letter to the local newspaper was at issue in *Pickering*, Foster was not speaking out on issues of general public concern, and unlike the employee seeking to expose corruption among public officials in *Porter*, Foster was merely airing an internal dispute over the extent of his supervisory powers. Finally, we find important the factor, often mentioned in cases considering the *Pickering* balance, *see, e. g., Pickering, supra*, 391 U.S. at 572 n.4, 88 S.Ct. at 1736 n.4; *Porter v. Califano*, 592

F.2d at 773, that Foster failed to avail himself of less disruptive methods of speech, particularly through internal channels, and instead took matters to an important client. Foster could have expressed his disagreement with Hersey's plan to other high-ranking officials of the SSIE. In particular, it would have been most appropriate to bring the matter to the attention of the various Smithsonian officials who were members of the SSIE board of directors. Instead, Foster chose to embarrass and pressure Hersey by bringing the internal matter to the notice of an officer of an organization with which the SSIE conducted a great deal of business. Under these circumstances, the factors to be considered in the *Pickering* balance, see *Pickering, supra*, 391 U.S. at 568–74, 88 S.Ct. at 1734–38; *Hanson v. Hoffman, supra*, 628 F.2d at 50; *Porter v. Califano, supra*, 592 F.2d at 773, clearly required the denial of First Amendment protection to Foster's actions.

## III. DUE PROCESS CLAIMS

■ Foster also asserts that his dismissal constituted a deprivation of a protected property interest without due process. We have some doubts whether Foster had any such property interest. In support of his claim, Foster submitted numerous affidavits from present and prior SSIE employees which state that the employees "understood" that they could be fired only for cause. He argues that there was a "common law" of tenure at the SSIE. *Cf. Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Nevertheless, it is undisputed that the SSIE's policy governing employee tenure was set forth in Smithsonian Institution Office Memorandum 712. That Memorandum states that "[a]ppointments may be terminated at any time." The policy is consistent with the SSIE's desire, like the Smithsonian, to place its employees outside the civil service system. It is also consistent with the purposes of the separate incor-

---

5. Despite our earlier holding that the SSIE's corporate form did not immunize the SSIE's actions from constitutional scrutiny, the form in which the SSIE operated is quite relevant in considering the efficiency interests of the government as required by *Pickering*. It is also relevant, as discussed below, in considering whether Foster had a property interest in continued employment and whether he received all the process that was due.

poration of the SSIE, which was undertaken specifically to avoid certain budgetary and employment restraints. Moreover, that position appears to be consistent with the law of the District of Columbia concerning the power of nonprofit corporations to remove their officials, *see* D.C.Code § 29–1025, and with the SSIE's bylaws which give the president authority to appoint officers for successive one-year terms.

As the Supreme Court has stated in *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

This court has recently remarked that "a legitimate claim of entitlement must derive from some reasonably identifiable source apart from the mere expectance or desire of the claimant." *Colm v. Vance*, 567 F.2d 1125, 1129 (D.C.Cir.1977).

Given the official policies of the SSIE regarding employment tenure, we find no reasonable basis for the expectation of tenure. Foster refers to a statement in the Smithsonian Institution's Handbook for Employees that an " 'indefinite' appointment ... does not exceed the duration of the program for which the job was created. Non-federal appointments may be terminated at any time due to lack of funds." Foster argues that the specific mention of termination due to lack of funds implies that lack of funds was the only ground—other than dismissal for cause—which could be relied upon for dismissal. This is a strained reading of the handbook, which states nothing about dismissal for cause, particularly when set against the express language of Smithsonian Memorandum 712. *Cf. Fiorentino v. United States*, 607 F.2d 963 (Ct.Cl.1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980) (government manual provisions did not furnish an objective entitlement due to conflict with federal regulations).

In any event, we affirm on this issue because we believe that Foster received all the process that was due. Foster received written notice of the adverse action taken against him along with the precise reasons supporting his dismissal. He was given notice of his right to an appeal and, upon invitation, obtained private counsel. He spoke with senior officials and submitted a large amount of written materials to a special Appeals Committee. He was offered the opportunity to appear before the Committee, with counsel if desired, but chose to rely upon the written submissions. The Appeals Committee reviewed the evidence and concluded that Foster's dismissal was appropriate. The Committee's findings were then forwarded to the entire SSIE board of directors which again upheld the dismissal.

The requirements of due process are flexible. *See, e. g., Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). *Cf. University of Missouri v. Horowitz*, 435 U.S. 78, 97, 98 S.Ct. 948, 958, 55 L.Ed.2d 124 (1978) (White, J., concurring) ("As I see it, assuming a protected interest, respondent was at the minimum entitled to be informed of the reasons for her dismissal and an opportunity personally to state her side of the story.") Here, such an opportunity was presented, along with the right to appear through counsel. There is no suggestion that the Appeals Committee failed to consider the evidence presented or acted unfairly in any respect.

Foster's major complaint with the process afforded him was that the Appeals Committee was not charged with a *de novo* review of the facts, but was asked only to decide whether Hersey's action in dismissing Foster was "reasonable" rather than "arbitrary or capricious." We fail to see any significance in this. Foster's dismissal did not involve any disputed facts or charges. The only question was whether the actions taken by Foster were sufficiently grievous to constitute misconduct justifying discharge. The Appeals Committee's mandate encompassed that question. Full, trial-type hearings have never been an absolute require-

ment of due process, *see, e. g., Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 16 n.17, 98 S.Ct. 1554, 1564 n.17, 56 L.Ed.2d 30 (1978); *Goss v. Lopez,* 419 U.S. 565, 581–84, 95 S.Ct. 729, 739–41, 42 L.Ed.2d 725 (1975); *Gray Panthers v. Schweiker,* 652 F.2d 146, at 148 n. 3 (D.C.Cir. 1981), and were quite unnecessary here given the lack of disputed facts and the corporate form of the SSIE, which was adopted to avoid requirements for hiring, promoting, demoting or discharging civil service employees. Finally, possible conflicts of interest of the Appeals Committee members were considered, but ultimately rejected. The Committee also adequately stated its grounds for decision.[6]

Because Foster's dismissal violated neither his First nor Fifth Amendment rights, we affirm the district court's grant of summary judgment for the defendants.

---

**6.** Foster also alleges that the damaging charges against him which accompanied his termination have stigmatized him and prevented him from obtaining further employment of the same type and at the same level as at the SSIE.
Therefore, he argues that he was deprived of a Fifth Amendment liberty interest without due process. Our holding above that Foster received all the process that was due disposes of his liberty interest claim.