SALINAS VALLEY COMMUNITY FEDERAL CREDIT UNION, Plaintiff,

v.

NATIONAL CREDIT UNION ADMINISTRATION, Defendant.

No. C–83–2009 RFP.

United States District Court,
N.D. California.

May 23, 1983.

Julie Barreto, California Rural Legal Assistance, Salinas, Cal., Richard M. Pearl, California Rural Legal Assistance, San Francisco, Cal., for plaintiff.

Kimberly A. Reiley, Asst. U.S. Atty., San Francisco, Cal., for defendant.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

## I. INTRODUCTION

 In this action, plaintiff seeks a preliminary injunction to prevent the National Credit Union Administration from liquidating plaintiff Salinas Valley Federal Credit Union without first affording plaintiff an adequate opportunity to present grounds and reasons why its charter should be restored and why it should not be placed in involuntary liquidation. On April 22, this court issued an order temporarily restraining defendant from making payment on insured accounts or payments to any other claimants against the assets of the credit union and from taking any other action that would render impracticable the restoration of plaintiff's charter and the resump-

tion of plaintiff's operations. Plaintiff contends that the due process clause of the fifth amendment requires that the NCUA provide the credit union with a hearing prior to the irreparable revocation of its charter and its involuntary liquidation. Although the constraints of due process generally require, at the minimum, that some form of notice and opportunity for informal response be made available prior to the extinguishment of a person's property interest, we hold that, in order to justify an award of extraordinary preliminary relief, a plaintiff must demonstrate that such procedural safeguards will be meaningful, that is, that relevant and material issues of fact exist which would be resolved by such procedures. The plaintiff in the present case has failed to adduce evidence sufficient to raise such serious issues of fact. We therefore conclude that the request for a preliminary injunction must be denied.

## II. FACTUAL BACKGROUND

The NCUA is the independent agency in the executive branch of the federal government which charters, supervises and insures federal credit unions under the Federal Credit Union Act, 12 U.S.C. §§ 1751–1795j. Federal credit unions are cooperative associations organized "for the purpose of promoting thrift among their members and creating a source of credit for provident or productive purposes." 12 U.S.C. § 1752(1). The Salinas Valley Credit Union was chartered December 2, 1968, to serve residents within a 10-mile radius of Soledad, California. It was designated a low-income credit union; it primarily serves farmworkers in the community. Its operation during the first ten years was variable, but it was strong enough in 1979 to expand and serve residents within a 20-mile radius.

An examination by the NCUA in 1978 demonstrated that the credit union was doing well and had a solid rating. From 1981 to the present, however, the organization has deteriorated substantially. The Declaration of Paul S. Schumacher, a Review Analyst for the NCUA, details this deterioration. An examination in January of 1981

revealed that the credit union was suffering numerous financial and operational problems. The amount of delinquent loans totaled a significant percentage of outstanding loans; collection problem loans represented a substantial percentage (96%) of total reserves; the credit union had no formal collection program nor were collection efforts being made; the individual share ledgers and the loan ledgers were not in balance with the general ledger control accounts; the Unapplied Data Processing Account contained further unlocated share and loan differences representing a $23,471 loss; the credit union's checking account statement showed a total which was $42,589 less than their records evidenced, representing another loss; a shortage of almost $10,-000 existed in the change fund, and the credit union could not account for this money; incorrect amortization of prepaid expenses and inadequate depreciation of furniture, fixtures, and equipment resulted in further losses; complete minutes of the monthly board of directors' meeting for the previous 26 months were not available; the credit committee had granted loans based upon loan applications which did not contain complete information and were unsigned by the applicant; a functioning supervisory committee was not in place, although federal law requires the existence of such a committee and directs that it conduct an internal audit every year; the share to asset ratio was 95—a ratio of 100 represents solvency. In light of these conditions, the examiner prepared and presented Records of Actions in which he set forth the procedures to be followed to correct the problems. The credit union was assigned an Early Warning System rating of "5" (unsatisfactory). As a result of the above, the Regional Director issued a Preliminary Warning Letter to the credit union officials on April 30, 1981.

Despite this letter, the credit union continued its extremely poor financial and organizational situation. Many of the above conditions persisted. Mr. Schumacher states that from January, 1981, to February, 1983, the union was never solvent. The share/asset ration was never higher than 97

and averaged 95. In February, 1983, the ratio had fallen to 84. Bookkeeping remained inadequate. The internal audit required by federal law was never completed, the last audit having occurred in 1978. The credit union was consistently unable to keep track of share deposits and loan payments; the general ledger repeatedly did not coincide with the individual shareholder cards or loan payment records. The total shares in the credit union declined by more than half from May, 1981, to February, 1983.

The NCUA made extensive efforts to assist the credit union. It examined the credit union on numerous occasions: January, 1981; May, 1981; July, 1981; August, 1981; February, 1982; November, 1982; and February, 1983. After each examination (except the last), the examiner staff worked with credit union officials to develop Records of Action to assist in resolving the credit union's problems. The EWS code of 5 continued throughout; five notices to this effect were sent to the credit union. From 1981 through early May, 1982, the National Association of Community Development Credit Unions offered assistance to the credit union; this, apparently, was the most positive period for the credit union. After the departure of this outside help, the credit union deteriorated significantly.

Based upon the extensive historical problems of the credit union, and its severe problems as revealed by the February, 1983, audit, the NCUA determined that the credit union was insolvent. This determination was premised upon the following: the factors resulting in the deficient share/asset ratio (uncontrolled delinquency, uncontrolled expenses, inadequate bookkeeping, and non-existent internal controls) had persisted for an extended period; as a result of the officials' inability effectively to control operations, continued dissipation of the share/asset ratio (already a precarious 84) was probable in the future; the deficient share/asset ratio would not have returned to normal limits within any estimated reasonable time frame because of the size of the operating deficit and the inability of the officials to control the operation. The NCUA found that the estimated loss to the insurance fund would increase with continued credit union operation for the reasons stated above.

The NCUA issued a Notice declaring insolvency on April 15, 1983, which was delivered to the credit union on April 18. With such Notice, the NCUA included a 26-page report outlining the reasons for the finding of insolvency. On April 19, the NCUA proceeded to assume control of the credit union property and began liquidation procedures.

## III. DISCUSSION

A preliminary injunction may issue only upon a clear showing by the moving party of either 1) probable success on the merits and the possibility of irreparable injury; or 2) that serious questions are raised and that the balance of hardships tips decidedly in favor of the party seeking relief. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980). In this case, the question raised on the merits concerns the constitutional permissibility *vel non* of the NCUA's liquidating a credit union without affording the minima of procedural due process. We conclude that plaintiff is not entitled to relief under either of the above standards.

### A. Probable Success on the Merits/Irreparable Harm

■ The NCUA has the power to suspend or revoke the charter of any Federal credit union, or place the same in involuntary liquidation and appoint a liquidating agent therefor, upon its finding that the organization is bankrupt or insolvent, or has violated any of the provisions of its charter, its bylaws, or any regulation issued thereunder.

12 U.S.C. § 1766(b)(1). Furthermore,

Upon its finding that a Federal credit union insured under this subchapter is bankrupt or insolvent, the Board shall close such credit union for liquidation and appoint himself liquidating agent therefor.

12 U.S.C. § 1787(a)(1). Such closure and liquidation is *mandatory, not discretionary.*

Insolvency is defined in 12 C.F.R. § 700.-1(k)(1):

Insolvency: A credit union will be determined to be insolvent when the total amount of its shares exceeds the present cash value of its assets after providing for liabilities unless:

(i) It is determined by the Board that the facts that caused the deficient share-asset ratio no longer exist; and

(ii) The likelihood of further depreciation of the share-asset ratio is not probable; and

(iii) The return of the share-asset ratio to its normal limits within a reasonable time for the credit union concerned is probable; and

(iv) The probability of a further potential loss to the insurance fund is negligible.

Until May, 1982, the regulations promulgated pursuant to the Act provided a formal hearing procedure for all federal credit unions facing involuntary liquidation. See former 12 C.F.R. §§ 747.701–.706. At that time, however, the Administration adopted an amendment to the regulations eliminating any administrative hearing for credit unions involuntarily liquidated on the grounds of insolvency and restricting the hearing procedure to instances of involuntary liquidation of solvent credit unions. 47 Fed.Reg. 22939 (May 26, 1982). In the official comments to both the proposed and final regulations, the Administration stated as reasons for the abrogation of the hearing procedure: 1) the administrative expense of providing hearings, which is borne by financially stable credit unions through their contributions to the insurance fund and their payment of operating fees; 2) the demonstrated deterioration of credit union assets and financial condition during the hearing process; 3) few hearings had been requested in the past; and 4) all previous revocations had withstood judicial review. As a result, under the current regulations, no administrative hearing procedure, either pre- or post-seizure, is available to a credit union closed by the NCUA for insolvency.

The due process clause of the fifth amendment generally requires that some form of hearing be provided before a person is *finally* deprived of a property interest. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The protections of due process attach, however, only upon a showing that the interest sought to be protected constitutes a "liberty" or "property" interest within the meaning of the due process clause. In order to enjoy a property interest in a particular governmental benefit, such as a license or a charter, a person "must have more than an abstract need or desire for it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). One must demonstrate an entitlement to the continued receipt or possession of such benefit; a mere unilateral expectation thereof will not suffice. Property interests are "created and ... defined by existing rules or understandings that stem from an independent source such as state law." *Id.*

In this case, the NCUA asserts that a federal credit union—and its officers, employees and members—does not enjoy such a property interest in its continued existence. Although the statutory scheme nowhere states that a credit union shall continue to exist absent good cause to the contrary, that principle is implicit throughout the statutory structure. That scheme sets forth the organizational form of a credit union, section 1753, and provides a procedure for Board approval of the organization certificate, section 1754, the acceptance of which renders the credit union a body corporate, "vested with all the powers and charged with all the liabilities conferred and imposed by this chapter on corporations organized hereunder." *Id.* Such a credit union must pay an annual operating fee, section 1755, shall be under the supervision of the Board, shall make annual financial reports to the Board and is subject to examination by the Board, section 1756. It possesses numerous corporate powers, section 1757.

This scheme appears to contemplate that, upon conferral of its charter, a federal credit union becomes an ongoing corporate enti-

ty whose existence shall continue undisturbed absent a determination of insolvency, section 1787, or misconduct, section 1786. Its right to continued existence does not rest in the uncontrolled discretion of the Board. The comprehensiveness and detail of the statutory scheme permit the credit union and its members reasonably to rely upon its right to operate absent the above malfeasances. We assume, without deciding, that such a reasonable expectation constitutes a property interest.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews, supra,* 424 U.S. at 333, 96 S.Ct. at 902, *quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The concept of "due process," however, is a flexible one "and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In determining "what process is due," the Supreme Court has utilized a balancing test, which

> generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews, supra,* 424 U.S. at 335, 96 S.Ct. at 903.

In this case, plaintiff is clearly not entitled to a *pre*-seizure hearing. In *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), the Court permitted a pre-hearing seizure of bank assets by a conservator appointed by the Federal Home Loan Administration pursuant to the regulations promulgated under the Home Owners Loan Act of 1933. Similarly, in *Fuentes v. Shevin,* 407 U.S. 67, 92, 92 S.Ct. 1983,

2000, 32 L.Ed.2d 556 (1972), the Court stated that an "extraordinary" situation, such as bank failure, would justify postponing notice and an opportunity to be heard.

However, these cases suggest that a *post*-seizure hearing would be mandated by the constraints of due process. In *Fahey,* the Court, in upholding the constitutionality of the challenged regulations, stated that the "delicate nature of the institution and the impossibility of preserving credit during an investigation" justified such summary procedures but noted that the regulations *did* provide for a post-seizure hearing. 332 U.S. at 253, 67 S.Ct. at 1556. Similarly, *Fuentes* merely discussed the unusual situations in which a hearing may be postponed, rather than denied altogether. *See also Fidelity Savings and Loan Ass'n v. Federal Home Loan Bank Bd.,* 689 F.2d 803 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983) (10-day statutory stay does not apply to closure of state chartered savings and loan association by federal receiver; due process satisfied by state law providing for possibility of post-seizure judicial review).

The NCUA asserts that a post-seizure hearing is not required in this situation. It concedes that there is no case law directly on point but argues by analogy from commercial banking law. Under the current statutory scheme, the Comptroller of the Currency may appoint a receiver "who shall proceed to close up [an] association," whenever the Comptroller is satisfied that such association is insolvent. 12 U.S.C. § 191. Defendant contends that the statute and regulations do not require that a hearing be held to ascertain whether insolvency exists, citing *In re Conservatorship of Wellsville National Bank,* 407 F.2d 223, 226 (3d Cir. 1969), *cert. denied,* 396 U.S. 832, 90 S.Ct. 85, 24 L.Ed.2d 82 (1969), and *In re Franklin National Bank,* 381 F.Supp. 1390 (E.D.N.Y. 1974). We need not resolve this issue in the instant case. The constitutional necessity *vel non* of such a hearing under the national banking laws is not significantly relevant to the present action. Moreover, the *Wellsville* court premised its decision, in part,

upon the fact that the plaintiffs therein had failed to invoke judicial review of the finding of insolvency, although such review *was available* to them on that issue. *See Wellsville, supra,* at 227.

The insolvency of a credit union does not create a situation which would justify denying a party the bare essentials of due process before his property interest is destroyed. *Compare North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (destruction of diseased poultry without a hearing). The shareholder members of a credit union will not suffer loss if the final closure and liquidation of their credit union is delayed pending a hearing or opportunity to respond. They enjoy this protection (up to $100,000) because their accounts are insured by an insurance fund to which all credit unions must contribute. We recognize that solvent credit unions, through their contributions, will bear any further financial burdens incurred during the pendency of a hearing. However, due process does not require that a failing credit union be permitted to operate for an inordinate period of time pending such an opportunity, nor does it necessarily require the full panoply of procedural safeguards and a formal evidentiary hearing. The mandates of due process vary with the nature of the question to be decided; a loose procedure of notice and opportunity for informal response may suffice. *See, e.g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Foster v. Ripley,* 645 F.2d 1142 (D.C.Cir.1981). *See also Mathews, supra.* It would seem that a credit union should be provided *some* minimal opportunity to object in writing to a finding of insolvency. Due process would be satisfied by a process which permitted a credit union, after notice, to submit its objections to the NCUA and which further afforded the credit union an opportunity to explore those objections. The entire process might be expedited, such that it would be concluded within a matter of several weeks.

■ On the basis of the foregoing, we conclude that an aggrieved credit union

should be afforded an opportunity to contest the NCUA's determination of insolvency before the credit union is finally liquidated. However, this conclusion does not justify this court in granting the plaintiff the extraordinary relief that it seeks. In order to warrant such preliminary relief, a plaintiff must seriously challenge the truthfulness of the facts upon which the threatened deprivation of property is premised. *See Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam). As previously noted, the credit union may assert a reasonable expectation in its continued existence *only absent misconduct or insolvency.* Hence, a hearing would serve, in this case, solely to explore the latter issue. The NCUA *must* revoke a credit union's charter and begin liquidation proceedings when the credit union becomes insolvent. Insolvency is presumptively established by a share-asset ratio that falls below 100. The initial determination of insolvency, then, is premised upon an objective criterion—a relatively straightforward calculation. This presumption may be dispelled only if, upon evaluation, the NCUA concludes that the four mitigative criteria enumerated in the regulations exist. These criteria are listed in the conjunctive; *all* must be satisfied in order to relieve the NCUA of its statutory obligation to initiate liquidation proceedings. By contrast to a determination of share-asset ratio, the statute contemplates that an analysis of these criteria will involve an exercise of administrative expertise and discretion. The NCUA must, on the basis of its experience, identify important problem areas which have significantly contributed to the credit union's unsound condition and must further prognosticate the future improvement *vel non* of these conditions.

A credit union's right to exist is presumptively *extinguished* if its share-asset ratio falls below 100. Unlike a case involving parole revocation, the agency (NCUA) does not enjoy the discretion to determine the appropriate ramifications that shall flow from such a finding. *Cf. Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Nor is it clearly obli-

gated by the regulations to ascertain the presence of the four mitigative factors; apparently the burden of proof concerning those factors lies with the credit union. If the credit union herein had seriously contested its present insolvency, as determined by its share-asset ratio, we would conclude that a hearing would in all probability be required, prior to the credit union's liquidation, in order to establish the presence of this crucial fact. The plaintiff, however, does not contest that its share-asset ratio is less than 100. Its bookkeeper, by his declaration, asserts that the ratio has risen from 84 to 95 since the February NCUA examination. Declaration of Angel Banuelos. But a share-asset ratio of 95 still constitutes insolvency. Moreover, that calculation was improperly performed. *See* Declaration (second) of Paul Schumacher. The current share-asset ratio is 82, having worsened since the February examination. *Id.* Since plaintiff has not successfully contested its share-asset insolvency, it has not been, nor will it be, injured by the absence of a hearing at which insolvency would otherwise be determined.

Similarly, the plaintiff has failed seriously to impugn the NCUA's determination that the above mitigative factors are absent. In its Examination Overview Report, the NCUA found the following: that shares, loans and assets had each decreased by more than 50% over the 26 month period, primarily as a result of the absence of dividend payments; that the credit union reserve structure was insufficient to cover material risks; that the credit union was never able to achieve profitability in any of its accounting periods and had paid no dividends since January of 1980; that minimal effort had been taken to reduce credit union expenses; that the credit union had insufficient cash and investments to meet its short- and long-term cash-flow needs; that due to high loan delinquency and heavy share withdrawal, the credit union had curtailed lending (the maximum non-share secured loan was $400); that loan applications were still inadequately screened; that loan delinquencies had risen from 11% to 26%; that delinquency follow-up was inadequate and a written collection program had not yet been developed; that uncollectible loans were not charged off; that the credit union had not developed a written investment policy that addressed safety, liquidity and diversification; that the required annual audit had still not been conducted (since 1978); that recordkeeping was still a major problem, with bank reconcilement and out-of-balance conditions having deteriorated. In sum, the NCUA concluded that:

> Credit union management has been ineffective and inadequate in planning and controlling credit union operations. While many of the current problems are noted to have been in existence prior to 1981, the present credit union management had been unable to channel its good intentions into positive results. A review of the NCUA Form 2045 statistical information discloses adverse and negative trends in all key financial areas. Out-of-balance conditions and bank reconcilement problems have not been properly addressed and still are categorized as major problem areas. The goal of being able to resume dividends appears more unattainable than ever, especially with a deficit reserve position and negative earnings projections. It would appear that the credit union cannot meet its mission, which is that of providing a competitive dividend and competitive services to its members.

Plaintiff contends that numerous of the findings contained in the above report, which bear upon the four mitigative criteria, are incorrect, and it asserts that it must be afforded an opportunity to present its objections and to explore the alleged discrepancies. Primarily, the credit union argues that its solvency may materially change in the future, in that: 1) the credit union anticipates an increase in share deposits during the area's growing and picking season; 2) the credit union may receive a donation of $100,000 from the Soledad Development Corporation; 3) the credit union has recovered approximately $13,000 of its loans which were older than one year; 4)

since September, 1982, the credit union has allegedly stabilized its bookkeeping and has reconciled its bank statements. Furthermore, Jose Rosillo, president of the Board of Directors and manager of the credit union, asserts that cash overages and shortages have not existed since September, 1982, and that a delinquent loan schedule was prepared in February, 1983.

If plaintiff could credibly demonstrate that such objections might satisfy the mitigative criteria, we would conclude that plaintiff should be allowed to present these contentions to the NCUA. In that case, we would be satisfied that the harm plaintiff would suffer upon liquidation might indeed flow from the failure of the statutory scheme to provide adequate procedural mechanisms. However, the above contentions do not adequately create a dispute concerning the NCUA's finding of insolvency. First, the credit union has experienced two full growing and picking seasons since January of 1981, yet it has remained insolvent throughout the entire period of the Examination Overview Report. Hence, this assertion rests in the realm of speculation. Second, the credit union's receipt of a $100,000 donation is, again, speculative at best. That grant is conditioned upon 1) the Soledad Development Corporation's future sale of a parcel of real property, a portion of the proceeds of which would comprise the grant and 2) the credit union's providing sufficient proof that it "has reorganized its board, committees, and management and is operating in compliance with all applicable regulations and statutes." Third, the credit union has failed either to document or to demonstrate the significance of the $13,000 loan recovery, that is, its relative importance. Fourth, the credit union has failed to produce documentary evidence—rather than conclusory assertions—that its bookkeeping has been stabilized and its statements reconciled.

Finally, plaintiff raises numerous further objections to the report's accuracy, asserting that:

1. The board of directors does consist of eleven members, rather than seven;

2. A delinquent loan schedule was prepared February 1983;

3. Cash overages and shortages have not existed since September of 1982;

4. The Packard Grant expenses were all recorded in the credit union's books;

5. Three payments have been received from the Farmworkers Credit Union in Keene, California, for the lease of a Burroughs L–6000 bookkeeping machine.

Second Declaration of Jose Rosillo at 3–4. These assertions, even if correct, are merely collateral or incidental to the substantive conclusions embodied in the report; they are not sufficiently significant to constitute legitimate objections to the NCUA's determination of insolvency. Rather, they pale by comparison to the body of the report.

■ We conclude that the plaintiff has failed seriously to raise an issue of fact in opposition to the NCUA's determination of insolvency. Although due process would, in all probability, require that a hearing be provided to resolve seriously contested issues which are both relevant and material to a finding of insolvency, the plaintiff in this case has failed to demonstrate that a hearing would be anything but a futile and unnecessary gesture. We are unwilling to afford preliminary relief to a plaintiff who raises a procedural due process claim in the absence of a credible showing that such relevant and material facts are seriously in dispute; the want of such a dispute would obviate the need for a hearing. *See Codd v. Velger,* 429 U.S. 624, 627–28, 97 S.Ct. 882, 883–84, 51 L.Ed.2d 92 (1977) (per curiam).

In this case, a hearing would serve to ventilate objections pertaining to the issues of insolvency and the presence *vel non* of the mitigative factors. In order to justify the provision of extraordinary relief, the plaintiff must demonstrate that the hearing which it seeks would serve a useful purpose. Although the court has allowed plaintiff ample opportunity to present its evidence on the above issues, plaintiff has failed to persuade the court that a material factual dispute exists. We therefore conclude that plaintiff has not demonstrated that it is likely to succeed on the merits of its due

process claim. Thus, despite the evident possibility that the credit union will suffer irreparable injury if the NCUA is permitted to proceed with its intended liquidation, we decline to grant preliminary relief under this standard.

B. Serious Questions Raised/Balance of Hardships

■ The plaintiff has similarly failed to satisfy this second test. Although the constitutionality of the new regulations governing the liquidation of insolvent credit unions is a serious and portentous issue, we conclude that the balance of hardships does not clearly tip in favor of the credit union. If the credit union is liquidated, the members will suffer substantial inconvenience, but not irreparable loss. They will not face a loss of assets if the credit union is closed. All accounts not exceeding $100,000 are fully insured, and the plaintiff has submitted no evidence that any member accounts exceed that limit. Furthermore, the members will not suffer a loss of "competitive dividends," which are amongst the benefits a credit union seeks to provide its members. This credit union has paid no dividends since January of 1980. Examination Overview Report at 2.

Mr. Rosillo contends that the credit union provides a variety of services to the community, including financial counseling, community orientation and referrals, no charge for checks drawn on the credit union's services, money orders available at a low rate of interest, copying services and Notary Public services. Declaration of Rosillo at 2. He asserts that these services are not available to the members elsewhere at affordable rates. However, neither he, nor the member-declarants Domingo Uribe or Catalina Vasquez, provides specific evidence that such services would be effectively unavailable. Their declarations merely proffer unsubstantiated conclusions to that effect. Such conclusory statements do not satisfy the plaintiff's burden of proof.

Moreover, plaintiff has proffered no evidence to demonstrate that its members do not have access to another sources of loan funds. Mr. Rosillo avers that the credit union offers loans at a rate of 12% on secured loans and 18% on unsecured loans. He does not, however—nor, again, do the other declarants—provide specific evidence that these rates are unusually low nor that similar loans are not available elsewhere. Furthermore, we note that, allegedly due to persistent high delinquency and heavy share withdrawals, the credit union has actually curtailed its lending; the Examination Overview Report states that at present, the credit union will offer a maximum (non-share secured) loan of $400. Report at 2. Thus, the credit union is not currently providing a source of substantial low-interest loan funds. In the absence of greater and more detailed evidence, we are not persuaded that, upon liquidation of the credit union, the members would lose significant and irreplaceable services.

If the court should rule that the credit union *cannot* be liquidated until it is afforded the minima of due process, several scenarios might occur. First, the credit union could continue to operate and could deteriorate further in this interim period, as evidently occurred with many credit unions under the prior regulations. Even then, the members' assets remain insured, but the insurance fund must bear the burden of the continued disintegration. Such a burden is not negligible. The insurance fund should not be utilized unnecessarily; it does not provide an unlimited source of funds and must serve the needs of all credit unions. Second, the credit union could remain closed, in which case the members would be denied access to their assets, and collection efforts would be suspended. This result would inconvenience the members, perhaps seriously, and could cause further harm to the credit union portfolio. Third, the NCUA might appoint a conservator to operate the credit union in the interim, section 1786(h). This alternative, although perhaps the most salutary, is not cost-free and would no doubt impose additional expenses upon the NCUA, which would be subsidized, at least in part, by solvent credit unions. We therefore hold that the balance of hard-

ships does not tip sharply in favor of the plaintiff.

IT IS THEREFORE ORDERED that the temporary restraining order is hereby dissolved and the plaintiff's request for a preliminary injunction is hereby DENIED.