**Michael E. HUBBARD, Appellee,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Appellant.**

**Michael E. HUBBARD, Appellant,**

v.

**ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY, Appellee.**

**Nos. 90–5250, 90–5233.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1991.

Decided Dec. 3, 1991.

On Petition for Rehearing and Suggestion for Rehearing En Banc March 2, 1992.

John D. Bates, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., R. Craig Lawrence and Mark E. Nagle, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant in 90–5250 and appellee in 90–5233.

Peter B. Broida, Arlington, Va., for appellee in 90–5250 and appellant in 90–5233.

Before EDWARDS and WALD, Circuit Judges, and FAIRCHILD,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Opinion concurring in part and dissenting in part filed by Circuit Judge WALD.

HARRY T. EDWARDS, Circuit Judge:

In 1982, Michael Hubbard applied for but was denied a job with the Environmental Protection Agency ("EPA"). The District Court found that EPA acted unlawfully in failing to hire Hubbard because of his exercise of First Amendment rights. The District Court ruled that, as appropriate equitable relief, Hubbard was entitled to be instated as a criminal investigator at EPA, at a grade and pay scale equal to that of persons hired in 1982; however, the trial court ruled that Hubbard could not be awarded back pay pursuant to an equitable action under the First Amendment. The District Court also refused to consider Hubbard's claim for attorney's fees under 28 U.S.C. § 2412(d) (1988). Hubbard here appeals from the denial of back pay and the trial court's failure to rule on his request for fees; the Government cross-appeals on the question of liability.

We agree with the trial judge that EPA violated Hubbard's First Amendment rights, so we affirm the judgment of the District Court on the question of liability. We reverse and remand, however, on the judgments with respect to back pay and fees.

### I. BACKGROUND

This litigation has now consumed a decade; unfortunately, the disagreements be-

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1988).

tween the parties seem as great now as when this law suit was initiated. The history of the case is detailed in the District Court's first judgment issued in 1984, a prior panel opinion of this court reviewing that judgment, a subsequent decision by this court sitting *en banc*, and two decisions of the District Court rendered following a remand of the case after *en banc* review. *See Hubbard v. EPA*, 809 F.2d 1 (D.C.Cir.1986), *vacated in part and aff'd sub. nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C.Cir.1988) (en banc), *on remand, Hubbard v. EPA*, 735 F.Supp. 435 (D.D.C. 1990), *modified*, 739 F.Supp. 654 (D.D.C. 1990). To put the case in focus, we offer here a brief review of the principal facts.

In 1981, while a detective with the District of Columbia Metropolitan Police Department ("MPD"), Hubbard participated in the highly publicized Capitol Hill drug investigation, pursuing allegations of drug use and distribution by Members of Congress and their staffs. Hubbard's involvement, and apparently the entire investigation, began when he received a tip from members of columnist Jack Anderson's staff, Jack Mitchell and Indy Badhwar. Following the tip, Hubbard arranged, with the help of Anderson's staff, to use a phone in Representative Robert K. Dornan's office as a cover to receive messages. The investigation eventually led to a number of arrests for alleged drug violations.

After the initial arrests in the case became public, Representative Dornan, who was a member of the Select Committee on Narcotics, requested an update on the investigation. Hubbard then met with the congressman, his assistant, Mitchell and Badhwar. Hubbard outlined the investigation and began to name suspects. Representative Dornan cut him off and requested a written memo, which Hubbard later provided; the memo named several suspects. The memo was later sent by Dornan's office to Anderson's office and to the Select Committee. Anderson published several columns about the investigation, although none of the suspects was named in any of the initial stories.

Sometime after publication of the story, officials at MPD removed Hubbard from the investigation; however, upon considering the situation, the MPD Chief of Police rejected a recommendation of disciplinary action against Hubbard. Accordingly, Hubbard was never sanctioned by MPD for any improper communications with Representative Dornan or the press. On this point, the trial court specifically found that "Hubbard's communications regarding the investigation were not insubordinate.... Hubbard was removed from the case after the publicity broke, but ultimately, was neither reassigned nor demoted. It was the considered judgment of his superiors in the police department that Hubbard did not act inappropriately in his communications regarding the investigation." 735 F.Supp. at 439.

In 1982, Hubbard applied for an investigator position with the newly formed Criminal Investigations Division at EPA. EPA's personnel division rated Hubbard's application "highly qualified." He was invited for an interview with Peter Beeson, the hiring official and Division director, William Graff, the chief of investigations, and Gary Steakley, the deputy chief. Both Graff and Steakley recommended that Hubbard be hired. Beeson, however, acted to block Hubbard's application.

Before his interview with Hubbard, Beeson apparently had talked with his fiancee, Laura Kiernan, a Washington Post reporter, about Hubbard's supposed press contacts. Although Kiernan refused to offer any information, Beeson claims to have had a "gut feeling" that Hubbard had made improper contacts with the press during the Capitol Hill investigation. Although Beeson admitted that he acted on these unverified suspicions, he did not share them with Graff or Steakley. As a consequence, Hubbard was told that he was rejected for employment because he lacked the requisite experience in white collar and corporate investigations. The District Court found as follows:

Because Hubbard had veteran's preference status, Beeson was required to prepare a "passover" document to justify selection of any applicant with a lower ranking than Hubbard on the certificate of eligibles. The passover document finally submitted to the EPA Personnel

Office indicated that Hubbard was not selected because he lacked the requisite white collar or corporate investigative experience. However, Hubbard had some white collar experience through training and school and, furthermore, had extensive experience in class I felony investigations. This experience satisfied the criteria listed in the Vacancy Announcement. *See* Joint Exhibit 1 (position requires skill in conducting investigations involving major corporations, white collar crime, and fraud). Moreover, several of the successful applicants had less white collar or corporate experience than Hubbard.

735 F.Supp. at 437.

Later in 1982, Hubbard discovered that MPD colleagues with no corporate or white collar crime investigation experience had been hired. After pursuing administrative remedies, he sued, originally bringing actions under the Privacy Act, 5 U.S.C. § 552a, and the Constitution. Under the Constitution, Hubbard sought both equitable relief based on the First Amendment and *Bivens*-type damages. After the District Court dismissed all of his claims, Hubbard appealed and this court reinstated his equitable action, but affirmed the dismissal of his damages action. *Hubbard v. EPA*, 809 F.2d at 11–12; *Spagnola v. Mathis*, 859 F.2d at 226–30.

Following remand and trial on the First Amendment claim, the District Court found that EPA had refused to hire Hubbard in violation of his First Amendment rights. *Hubbard v. EPA*, 735 F.Supp. 435 (D.D.C.1990). In its initial opinion on remand, the District Court ruled that Hubbard should be instated and awarded back pay, but that no attorneys' fees would be awarded. *Id.* at 440. In a subsequent memorandum opinion, 739 F.Supp. 654 (D.D.C.1990), the District Court affirmed its liability ruling but reversed its award of back pay.

Hubbard's appeal challenges the denial of back pay and attorneys' fees. EPA cross appeals, contending that the District Court erred in finding that it violated Hubbard's speech rights.

## II. THE FIRST AMENDMENT CLAIM

In *Pickering v. Board of Education*, 391 U.S. 563, 574, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811 (1968), the Supreme Court held that an employee's "exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." In evaluating challenges under *Pickering*, the courts have utilized a four-prong test:

[T]he *Pickering* cause of action has four elements. First, the public employee must have been speaking on a matter of public concern. If the speech is not of public concern, "it is unnecessary ... to scrutinize the reasons for [the] discharge," at least "absent the most unusual circumstances." Second, the court must "balance" the interests of the employee, "as a citizen, in commenting upon matters of public interest and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through it employees." Third, the employee must prove that his speech was a substantial or motivating factor in his discharge. Finally, the government employer must be given an opportunity to prove that it would have reached the same decision even absent the protected conduct.

The first two inquiries are questions of law for the court to resolve. The latter two are questions of fact ordinarily left to the jury.

*Hall v. Ford*, 856 F.2d 255, 258 (D.C.Cir. 1988) (citations omitted).

■ EPA does not seriously contest the first and third prongs of the test. The District Court found, and we agree, that Hubbard's speech touched a matter of public concern. "Certainly, the allegation that members of Congress use illegal narcotics is a matter of public concern." 735 F.Supp. at 438. Additionally, at the time he communicated with Representative Dornan, Hubbard was not involved in any dispute regarding his job. Often, where speech has been found not to be of public concern, "the content, form, and context" have revealed it to address personal employment grievances. *See Connick v. Myers*, 461

U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983). Hubbard had no such personal grievances in this case. The Government points to some testimony suggesting that Hubbard was frustrated with MPD's slow pace on the investigation, Trial Transcript ("Tr.") vol. I, at 155, *reprinted in* Joint Appendix ("J.A.") 140, but this surely does not contradict or otherwise detract from the conclusion that the disputed event was a matter of public concern. Indeed, Hubbard's motivation, unless personal, is irrelevant to whether the speech itself is a matter of public concern.[1]

■ EPA also effectively concedes that Hubbard's speech was a "substantial" or "motivating" factor in the decision not to hire him. Beeson admitted as much at trial, *e.g.*, Tr. vol. I, at 170–75, *reprinted in* J.A. 155–60, and the District Court specifically found that Beeson's belief that Hubbard had press contacts, not lack of corporate crime investigation experience, was "the real reason" Beeson did not hire Hubbard. 735 F.Supp. at 437.

In light of the foregoing, we find that Hubbard was "speaking on a matter of public concern," and that his "speech was a substantial or motivating factor" in EPA's decision not to hire him. We turn now to consider the second and fourth prongs of the *Pickering* test, the principal foci of EPA's cross-appeal.

### A. *The* Pickering *Balance*

Under the second prong of *Pickering*, the court's task "is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88

S.Ct. at 1374–75. In this case, the District Court struck the balance in favor of Hubbard.

[T]he government in this case failed to demonstrate that Hubbard, by virtue of his prior contacts with the press, could not perform the job of criminal investigator with the EPA successfully. Nor did the government attempt to show that it had an interest in discipline or morale in the workplace which would be irreparably compromised by Hubbard's presence.

735 F.Supp. at 438–39 (citations omitted).

The EPA asserts that the District Court struck the wrong balance and erred by (1) requiring a showing of harm to discipline and morale, thereby ignoring the impact on the efficiency of the office, (2) discounting the special deference that should be accorded law enforcement agencies, and (3) imposing an irreparable harm standard. We disagree. The District Court committed no legal error in its judgment and, on the record at hand, the court was fully justified in reaching the result that it did.

■ Hubbard's investigation for MPD began as a result of tips received from the Anderson staffers and continued through Hubbard's cover in Representative Dornan's office. Hubbard did not communicate outside this circle and asked Dornan's office to keep the written memo "confidential." Tr. vol. I, at 124–25. Thus, this case does not present a situation in which a government employee has jeopardized an employer's operation by calling a press conference or indiscriminately leaking sensitive information. Nor does this case involve an employee who acted with disloyalty or in a manner otherwise at odds with the legitimate interests of his employer. Hubbard was not disciplined by MPD; he was not found to have engaged in insubordinate or otherwise wrongful conduct; and

---

1. The Government asserts that Hubbard's motivation makes this case identical to *Foster v. Ripley*, 645 F.2d 1142 (D.C.Cir.1981), where the court found against the employee. In *Foster*, a section head of the Smithsonian faced a reorganization that would have cost him much of his jurisdiction. The employee induced outside clients to pressure the Smithsonian board by telling the clients that the reorganization would compromise the Smithsonian's ability to meet those clients' needs. The court found that the employee failed to stay within proper channels in making his complaint known and that he had acted "to advance his own interests as an employee, interests that would be no different if his employer were not the government." *Id.* at 1148. Here, there is no evidence that Hubbard acted in any way for his own benefit.

he did not compromise the Capitol Hill drug investigation. *See* 735 F.Supp. at 439. These findings by the trial court, which are not clearly erroneous, make it clear that Hubbard did nothing to impair the efficiency of the MPD operation, and nothing that he did at MPD reasonably indicated that he would adversely affect the efficiency of EPA's operation.

Even if we owe no deference to the factual findings of the District Court and engage in *de novo* review, we would still find in Hubbard's favor.[2] Hubbard's report to Representative Dornan clearly served the public interest by informing a policymaker responsible for drug policy of suspected use and distribution among Members of Congress and their staffs. EPA introduced no evidence that the Capitol Hill drug investigation suffered in any way. Although the documentary evidence suggests that Hubbard's claims that Members of Congress were involved may have been exaggerated, no names were made public by Anderson's office until *after* those names were presented to the federal grand jury and the House Ethics Committee. *See* H.R.Rep. No. 559, 98th Cong., 1st Sess. 390 (1983) (reprinting a Jack Anderson column), *introduced as* Defendant's Exhibit A. In fact, the Special Counsel appointed by the House Ethics Committee found that Hubbard did not leak the names of Members to Anderson. *Id.* at 14. Finally, as noted above, the MPD Chief of Police reviewed the case and specifically *declined* to take any disciplinary action against Hubbard.

It is hardly surprising that Hubbard suffered no discipline at MPD; as the trial court correctly found, Hubbard's contacts with Dornan were authorized.

> [I]t was United States Representative Robert K. Dornan who authorized the use of his office and telephone number as a front for Hubbard's undercover work on Capitol Hill. Conducting an investigation with the aid of persons outside the police organization carries a cer-

tain amount of risk of unauthorized or premature disclosure. It appears to the Court that in authorizing this investigation, the Metropolitan Police Department made a judgment that the benefits of cooperation in this case outweighed this risk. In light of these circumstances, it is clear to the Court that Hubbard's initial contacts with the press and Representative Dornan were authorized, and deserving of first amendment protection.

739 F.Supp. at 656.

Furthermore, we find the EPA's alleged concern over the efficiency and confidentiality of *its* investigations to be pretextual. This rationale was not offered until after Beeson had decided not to hire Hubbard. When he first passed over Hubbard, Beeson acted on nothing more than a "gut feeling" he assertedly developed when he mentioned Hubbard's name to his fiancee, Laura Kiernan. Tr. vol. I, at 174, *reprinted in* J.A. 159. After talking with Kiernan, Beeson apparently rejected Hubbard on the basis of supposed press contacts without knowing anything about the context of those contacts. Beeson testified that he "press[ed] [Laura Kiernan] on more than one occasion for information she might have [on Hubbard]," but she "refused to give it and basically made it clear that [any information she had] was not firsthand but rather it was hearsay." Tr. vol. I, at 148, *reprinted in* J.A. 133. Nonetheless, Beeson confirmed that he

> had made a determination, based on basically my gut feeling from my interactions with Laura, together with an absence of white collar crime and corporate experience, that Mr. Hubbard was not going to be hired; that I would pass him over, and we drafted a passover document for that purpose. And, the passover document was based on his lack of white collar crime and corporate defendant experience.

Tr. vol. I, at 151–52, *reprinted in* J.A. 136–37.

As Beeson admitted, "the primary reason" he passed over Hubbard was the in-

---

**2.** Although it is clear that we must perform the balancing *de novo*, whether or not we defer to the factual findings of the District Court to conduct that balancing is unclear. *See Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10 (calling for "independent constitutional judgment on the facts of the case"). Here, because we agree with the District Court under either formula, we need not resolve the issue.

formation that he gleaned from his fiancee. Tr. vol. I, at 164–65, *reprinted in* J.A. 149–50. The "other reason," *i.e.,* Hubbard's alleged lack of white collar crime experience, *id.,* was a sham. On this latter point, the trial court specifically found that

> the real reason Beeson decided not to hire Hubbard was his belief that Hubbard was responsible for press leaks which compromised the Capitol Hill investigation. The Court is troubled by the fact that officials at EPA were not straightforward with their true reasons for passing over Hubbard. Their attempts to conceal the truth, and the assertion of a patently inadequate basis for rejecting Hubbard, buttress the Court's conclusion that EPA's actions regarding Hubbard's application were constitutionally suspect.

735 F.Supp. at 437.

It was only *after* Beeson had acted to block the hiring of Hubbard that he had occasion to discuss Hubbard's involvement in the Capitol Hill drug investigation with MPD Detective Dave Hopkins. Hopkins told Beeson that Hubbard had communicated with Representative Dornan about the investigation. But at no time did Beeson find out exactly what was said, to whom, or to what effect. Although he gained no concrete information from Hopkins, Beeson nonetheless claimed that his talk with Hopkins "provided an additional sign of [Hubbard's] lack of sensitivity to the proper handling of sensitive information in an ongoing investigation." Tr. vol. I, at 157, *reprinted in* J.A. 142. On cross-examination, however, Beeson reiterated that his view not to hire Hubbard was formed well before he talked with Hopkins:

> Q. As I understand it, your decision not to hire Mike Hubbard was made on the 19th of August, at least two weeks before your conversation with Mr. Hopkins; right?
>
> A. Yes. At that point my decision was based on my gut feelings in talking with Laura [Kiernan].

Tr. vol. I, at 170–71, *reprinted in* J.A. 155–56. Thus, based solely on his "gut feelings" about Hubbard's unverified contacts with the press, Beeson rejected Hubbard's bid for employment.

The obvious weakness in the Government's case is that there was no real content to Beeson's rejection of Hubbard on the basis of supposed press contacts; thus, we are left with an adverse employment action based on nothing more than the speech of a prospective employee with respect to a matter of public concern. In an apparent effort to avoid this hole in its case, the Government now asserts that law enforcement agencies are entitled to something approaching an irrebuttable presumption that their efficiency is compromised whenever their employees speak publicly. This position is baseless.

■ As we have held in the past, a police officer does "not completely shed his First Amendment rights when he accept[s] employment as a public servant. 'Policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.' " *Tygrett v. Washington,* 543 F.2d 840, 849 (D.C.Cir.1974) (quoting *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967)). We recognize that some decisions have held that "[t]he First Amendment does not protect personal behavior in the law enforcement context to the same extent that it does in other areas of Governmental concern," *McMullen v. Carson,* 754 F.2d 936, 939–40 (11th Cir.1985). Even accepting this as true, however, it does not follow that the *individualized consequences* of an officer's speech may be ignored. *See Tygrett,* 543 F.2d at 849–50 ("[D]ischarge [can] be justified only by a *specific finding that the statements in question* adversely affected his efficiency as a police officer or the efficiency of the Department as a police force.") (emphasis added); *McGehee v. Casey,* 718 F.2d 1137 (D.C.Cir.1983) (conducting a case specific review of the CIA's decision, pursuant to regulations, to censor parts of a former agent's writings).

Furthermore, this is not a case in which the employer claims that the employee violated some agency "regulation" prohibiting the release of information. *See, e.g., Jurgensen v. Fairfax Cty.,* 745 F.2d 868, 883–84 (4th Cir.1984). Hubbard was authorized

to work through Congressman Dornan; the trial court found that he engaged in no act of insubordination with respect to the investigation; and it is undisputed that he was never disciplined by MPD for any improper conduct during the investigation.[3] Thus, even if a "regulation" against the release of information could obviate the need for an individualized assessment under *Pickering*, there is no evidence in this case to indicate that MPD invoked any such regulation or that Hubbard breached it.

■ EPA also argues that its decision is entitled to increased deference because it was faced with a *hiring* decision, not a disciplinary decision. Merely because an employer is *hiring* rather than *firing*, however, does not justify unconstitutional action. There can be no serious question that even individuals without property interests in their jobs cannot be discriminated against on the basis of their speech. *See, e.g., Rankin v. McPherson,* 483 U.S. 378, 383–84, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987) (holding that a probationary employee may not be fired for speech reasons); *Mount Healthy Board of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) (same); *Franklin v. Atkins,* 562 F.2d 1188, 1190 (10th Cir.1977) (In a *Pickering* case, the court wrote: "[T]he Regents need give no reason for a refusal to hire, and in fact need have no reason at all. However, it is equally obvious that they could not refuse to hire for a constitutionally impermissible reason.") (citations omitted), *cert. denied,* 435 U.S. 994, 98 S.Ct. 1645, 56 L.Ed.2d 83 (1978).

In making hiring decisions, employers are free to draw "reasonable inferences of harm from the [prospective] employee's speech, his position, and his working relationship with his superior." *Hall v. Ford,* 856 F.2d at 261. Indeed, in assessing prospective employees, an employer need not prove actual harm or make a showing of "irreparable injury" in order to survive a challenge under *Pickering.* As the Court said in *Connick,* an employer is not re-

quired to "tolerate action which he *reasonably believed* would disrupt the office, undermine authority, and destroy close working relationships," 461 U.S. at 154, 103 S.Ct. at 1694 (emphasis added); and an employer need not "allow events to unfold" in determining whether actual harm might occur, *id.* at 152, 103 S.Ct. at 1692. Nonetheless, it is also clear that "unadorned speculation as to the impact of speech ... on the government's enterprise will not suffice." *Hall,* 856 F.2d at 261. In this case, Hubbard was denied a job solely on the basis of Beeson's "unadorned speculation" about Hubbard's supposed press contacts.

EPA failed to show in any way that Hubbard's discussions with Dornan, Mitchell and Badhwar compromised his efficiency or the efficiency of the MPD. With the District Court, we conclude that "the selecting official at EPA made the decision not to hire Hubbard on an impermissible basis—Hubbard's exercise of his first amendment right of free speech," 739 F.Supp. at 656, and that "the government in this case failed to demonstrate that Hubbard, by virtue of his prior contacts with the press, could not perform the job of criminal investigator with the EPA successfully." 735 F.Supp. at 438.

On the basis of all of the foregoing, we conclude that, under the second prong of *Pickering,* the balance of interests clearly weigh in favor of Hubbard.

### B. *Would EPA Have Made the Same Decision Absent Hubbard's Speech?*

■ Under the fourth prong of *Pickering,* the employer must be given the opportunity to prove that it would have reached the same decision even absent the protected conduct. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Hall,* 856 F.2d at 258. This is a question of fact, *Hall,* 856 F.2d at 258, and, as such, the trial court's findings on this point may not be set aside unless "clearly erroneous." *See Anderson v. Bessemer City,* 470 U.S. 564, 573–81, 105 S.Ct. 1504, 1511–15, 84 L.Ed.2d 518 (1985); *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). The Dis-

---

**3.** In its appeal to this court, EPA has made no claim that Hubbard violated some MPD regula-

tion in his handling of the Capitol Hill drug investigation.

trict Court found that Beeson's beliefs about Hubbard's speech were the but-for cause of EPA's refusal to hire. We have no basis to overturn this finding.

EPA asserts that Hubbard's lack of white collar and corporate crime investigation experience made Hubbard unqualified. But, the trial testimony demonstrated that white collar and corporate crime experience was not a mandatory qualification; experience investigating class I felonies, which Hubbard had, was an adequate substitute. Tr. vol. I, at 63 (Testimony of William Steakley). Other candidates without white collar or corporate crime experience were hired. *Id.* at 86. The District Court concluded:

> The record reflects that Hubbard's qualifications were equal to or exceeded those of lower-ranked candidates ultimately hired for the positions. Hubbard was not offered a position despite the recommendation of Steakley, shared by Graff, that he be hired. In light of this evidence, the Court concludes that were it not for Hubbard's speech regarding the Capitol Hill investigation, he would have been hired as a criminal investigator by EPA.

735 F.Supp. at 439.

In sum, there can be no doubt on this record that the District Court was correct in finding that EPA violated Hubbard's First Amendment rights when it refused to hire him.

### III. ATTORNEYS' FEES

Because we affirm the District Court's liability determination, we proceed to decide whether Hubbard may recover attorneys' fees or back pay or both. In this section, we conclude that the District Court on remand should entertain a petition for attorneys' fees.

■ In his proposed findings of fact and law, Hubbard requested the opportunity to submit a petition for attorneys' fees under the relevant part of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (1988). Relying on *Unification Church v. INS*, 762 F.2d 1077 (D.C.Cir.1985), the District Court held that Hubbard could not

recover fees under section 2412(b) because his claim was not analogous to an action that would give rise to a fee award claim under 42 U.S.C. § 1988. 735 F.Supp. at 440. Hubbard sought reconsideration, asserting that his claim would fall under section 2412(d), which awards attorneys' fees

> in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (1988). The District Court denied the motion for reconsideration.

In light of EPA's appeal on the liability issue, there is no harm done in the District Court's failure to consider the request for fees under section 2412(d). *See Melkonyan v. Sullivan*, — U.S. —, 111 S.Ct. 2157, 2162, 115 L.Ed.2d 78 (1991) (time for bringing EAJA petition begins when judgment is final and *not* appealable). The District Court was in error, however, in suggesting that there was no issue under section 2412(d). Hubbard clearly is a "prevailing party" under relevant case law, *see Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (holding that a partially prevailing party is still a prevailing party), and would be even if he had only been entitled to instatement, as the District Court thought. *See also Raton Gas Transmission Co. v. FERC*, 891 F.2d 323, 327–28 (D.C.Cir.1989). On remand the District Court should entertain Hubbard's petition for fees.

### IV. THE CLAIM FOR BACK PAY

The District Court heard Hubbard's First Amendment action pursuant to its general federal question jurisdiction to decide all cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1988). "This jurisdictional grant provides not only the authority to decide whether a cause of action is stated by a plaintiff's claim that he has been injured by a violation of the Constitution,

but also the authority to choose among available judicial remedies in order to vindicate constitutional rights." *Bush v. Lucas,* 462 U.S. 367, 374, 103 S.Ct. 2404, 2409, 76 L.Ed.2d 648 (1983) (citation omitted).

Hubbard clearly is entitled to full equitable relief. Both the prior panel and *en banc* decisions, while ruling out *Bivens*-damages, held that the court could grant equitable relief. *Hubbard,* 809 F.2d at 11–12; *Spagnola,* 859 F.2d at 229–30. Equitable relief against the United States is authorized by the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (1988),[4] which waives sovereign immunity for relief other than money damages. Hence, Hubbard's ability to recover back pay, as distinct from *Bivens*-damages, turns on whether or not back pay is properly characterized as equitable relief. We believe that it is.[5]

## A. *Back Pay as Equitable Relief*

Courts have recognized the equitable nature of back pay awards in a number of different contexts. Generally, these decisions hold that back pay constitutes the very thing that the plaintiff would have received but-for the defendant's illegal action; back pay is thus seen to reflect equitable restitution. Some decisions also justify a back pay award as incidental to an equitable instatement order. On either rationale, there is strong authority supporting Hubbard's claim for back pay relief in this case.

A case in point is *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), in which the Supreme Court expressly described back pay as an equitable award. The Court in *Bowen* considered a challenge to a disallowance of Medicaid disbursements made by the Secretary of Health and Human Services. The Court held that section 702's waiver of sovereign immunity extended to monetary awards which could be characterized as equitable relief. The Court specifically cited *"reinstatement ... with back pay"* to illustrate a form of equitable relief, as distinguished from money damages.

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with back pay, or for "the recovery of specific property *or monies,* ejectment from land, or injunction either directing or restraining the defendant officer's actions."

487 U.S. at 893, 108 S.Ct. at 2731–32 (quoting *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949)). Although the reference to "back pay" is offered only by way of example in *Bowen,* it is a critically important citation because the entire *Bowen* decision focuses on the distinction between money awarded in equity as specific relief and "money damages."

The Court's statement in *Bowen* is hardly surprising, for the concept of back pay as equitable relief has been recognized by the Supreme Court in other contexts as well. In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), for example, the Court characterized back pay under Title VII as equitable relief. Although noting that Congress had

---

4. That section provides in part:
   A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (1988).

5. Although the Government does not advance the point, we think it important to note that our decision to award back pay does not give rise to exclusive jurisdiction in the Claims Court. *See United States v. Connolly,* 716 F.2d 882, 886–87 (Fed.Cir.1983) (en banc) (Claims Court did not have Tucker Act jurisdiction because First Amendment, by its terms, does not mandate payment of money), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984); *Clark v. Library of Congress,* 750 F.2d 89, 103 n. 31 (D.C.Cir.1984) (same).

included back pay among several statutory remedies available to redress Title VII violations, the Court observed that the judicial discretion to award back pay "is equitable in nature," consistent with the "historic power of equity to award lost wages." *Id.* at 416, 95 S.Ct. at 2371. In fact, the Court characterized the statutory reference to back pay, *see* 42 U.S.C. § 2000e–5(g) (1988), as a congressional reference to courts' inherent authority, not as a grant of any new remedial authority.

> It is true that "[e]quity eschews mechanical rules ... [and] depends on flexibility." But when Congress invokes the Chancellor's conscience to further transcendent legislative purposes, what is required is the principled application of standards consistent with those purposes and not "equity [which] varies like the Chancellor's foot." ...
>
> ....
>
> It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination. This is shown by the very fact that Congress took care to arm the courts with full equitable powers. For it is the historic purpose of equity to "secur[e] complete justice."

422 U.S. at 417–18, 95 S.Ct. at 2371–72 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946); *Brown v. Swann*, 35 U.S. (10 Pet.) 497, 503, 9 L.Ed. 508 (1836)); *see also* 118 Cong.Rec. 7168 (1971) ("The provisions of this subsection are intended to give the courts wide discretion in exercising their equitable powers to fashion the most complete relief possible.") (statement of Senator Williams, introducing the Conference Report to the 1972 Title VII amendments).

In Seventh Amendment cases, where the right to a jury trial turns on whether the relief sought is legal or equitable, the Court has continued to note the equitable nature of Title VII back pay awards. In *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), the Court held

that damages under Title VIII for race-based denials of housing were legal in nature and must be awarded in a jury trial. For contrast, the Court cited the back pay remedy under Title VII.

> We need not, and do not, go so far as to say that any award of monetary damages must necessarily be "legal" relief. A comparison of Title VIII with Title VII of the Civil Rights Act of 1964, where the courts of appeals have held that jury trial is not required in an action for reinstatement and backpay, is instructive, although we of course express no view on the jury trial issue in that context. In Title VII cases the courts of appeals have characterized backpay as an integral part of an equitable remedy, a form of restitution.

*Id.* at 196–97, 94 S.Ct. at 1009–10 (citations and footnote omitted). Similarly, in *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), the Court reiterated that it has noted that "backpay sought from an employer under Title VII would generally be restitutionary in nature." 110 S.Ct. at 1349.[6] *See also Lehman v. Nakshian*, 453 U.S. 156, 166–67, 101 S.Ct. 2698, 2704–05, 69 L.Ed.2d 548 (1981); *Great American Federal Savings & Loan Assn. v. Novotny*, 442 U.S. 366, 375, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979); *Lorillard v. Pons*, 434 U.S. 575, 584–85, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978).

Those Courts of Appeals which have addressed the issue have been unanimous in holding that an action for back pay under Title VII, at least when joined with a claim for reinstatement and not joined with a damages claim, is equitable and gives rise to no jury trial right. *See Ramos v. Roche Products, Inc.*, 936 F.2d 43, 49–50 (1st Cir. 1991); *Walton v. Eaton Corp.*, 563 F.2d 66, 69, 84 (3d Cir.1977); *Cox v. Babcock & Wilcox Co.*, 471 F.2d 13, 14 (4th Cir.1972); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1125 (5th Cir.1969); *Moore v. Sun Oil Co.*, 636 F.2d 154, 156

---

**6.** *Terry* involved an employees' suit for damages against their Union for breach of the duty of fair representation. Although the employees' lost earnings were a measure of damages, the relief was nonetheless viewed as legal, not equitable. Lost earnings were not the very thing to which the plaintiffs would have been entitled from the Union had there been no breach of the duty of fair representation; however, lost earnings were a legitimate measure of compensation due for the injuries suffered by plaintiffs by virtue of the Union's wrongdoing.

(6th Cir.1980); *Grayson v. Wickes Corp.,* 607 F.2d 1194, 1196 (7th Cir.1979); *Harmon v. May Broadcasting Co.,* 583 F.2d 410 (8th Cir.1978) (per curiam); *Slack v. Havens,* 522 F.2d 1091, 1094 (9th Cir.1975); *Snider v. Circle K Corp.,* 923 F.2d 1404, 1407 (10th Cir.1991); *Lincoln v. Board of Regents,* 697 F.2d 928, 934 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). This line of cases also answers the possible contention that Title VII awards, because authorized by statute, are somehow different than back pay awards. The constitutional question does not change because Congress has created the right. *See Curtis,* 415 U.S. at 194, 94 S.Ct. at 1008.

Although not confronting the Seventh Amendment question directly, this Circuit has endorsed the proposition that in a Title VII action "back pay is not in the nature of a claim for damages, but rather an integral part of the statutory equitable remedy." *Evans v. Sheraton Park Hotel,* 503 F.2d 177, 186 (D.C.Cir.1974) (quoting *Johnson v. Georgia Highway Express,* 417 F.2d at 1125).[7]

Another area in which the Supreme Court has recognized the equitable nature of back pay awards is in actions under the Fair Labor Standards Act. In *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), the Court held that courts had equitable jurisdiction to award back pay. The Court first characterized the specific action in question, an action by the Secretary of Labor to enjoin violations of section 15(a)(3) of the Act, 29 U.S.C. § 215(a)(3), as an equitable action. *Id.* at 292, 80 S.Ct. at 335. The Court then held it within a court's equitable jurisdiction to award back pay to protect the rights created in the Act. *Id.* at 292–93, 80 S.Ct. at 335–36. Notably, the remedial section of the FLSA, unlike Title VII, at the time contained no reference either to back pay or equitable relief in general. *See* 29 U.S.C. § 217 (1958) (District Courts may "for cause shown, ... restrain violations of section 15"). The Court expressly

refuted the idea that a statute must authorize a back pay award. "The court below took as the touchstone for decision the principle that to be upheld the jurisdiction here contested 'must be expressly conferred by an act of Congress or be necessarily implied from a congressional enactment.' In this the court was mistaken." 361 U.S. at 290, 80 S.Ct. at 334. Quoting from *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946), where the Court used its equitable jurisdiction to force the refund of rents extracted in violation of wartime price controls, the Court continued: "Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." 361 U.S. at 291, 80 S.Ct. at 334.

Implied private rights of action under the Title VI prohibition of discrimination against the handicapped provide yet another context in which the Supreme Court has recognized the equitable nature of back pay awards. *See Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). In *Darrone,* the Court faced as a threshold matter the question whether or not the implied right of action survived the plaintiff's death. The Court held that it did:

> Without determining the extent to which money damages are available under § 504 [29 U.S.C. § 794], we think it clear that § 504 authorizes a plaintiff who alleges intentional discrimination to bring an equitable action for backpay.

*Id.* at 630, 104 S.Ct. at 1252.

In addition to the foregoing areas, the courts of appeals have authorized equitable back pay awards in a number of other cases. *See, e.g., Bertot v. School Dist. No. 1,* 613 F.2d 245, 250 (10th Cir.1979) (en banc) (equitable back pay remedy available in *Pickering* cases); *McKinley v. City of Eloy,* 705 F.2d 1110, 1116 n. 3 (9th Cir. 1983) (same); *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 488–90 (4th Cir.1982) (recognizing equitable nature of back pay

---

**7.** Of course, the Seventh Amendment question is in no way before us now. We note these decisions merely to demonstrate that courts have recognized backpay as an equitable remedy.

award under Age Discrimination in Employment Act); *Dickerson v. Deluxe Check Printers, Inc.,* 703 F.2d 276, 281 (8th Cir. 1983) (same); *Troy v. City of Hampton,* 756 F.2d 1000, 1002 (4th Cir.) (back pay under Veteran's Reemployment Rights Act is equitable), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); *Skeets v. Johnson,* 805 F.2d 767, 774–75 (8th Cir. 1986) (awarding equitable back pay for interim between termination in violation of due process and the required hearing), *rev'd on other grounds,* 816 F.2d 1213 (8th Cir.1987) (en banc); *McGhee v. Draper,* 639 F.2d 639, 646 (10th Cir.1981) (same); *Gurmankin v. Costanzo,* 626 F.2d 1115, 1122 (3d Cir.1980) (awarding equitable back pay in action under 42 U.S.C. § 1983 to victim of discrimination on the basis of blindness), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981); *McFerren v. County Board of Educ.,* 455 F.2d 199, 203–04 (6th Cir.) (holding there was no jury trial right where court ordered reinstatement and back pay to teachers fired after desegregation order; in discrimination case, back pay is equitable), *cert. denied,* 407 U.S. 934, 92 S.Ct. 2461, 32 L.Ed.2d 817 (1972); *Santiago–Negron v. Castro–Davila,* 865 F.2d 431, 441 (1st Cir.1989) (in patronage hiring case, back pay award, if not joined with damages claim, is equitable).[8]

These precedents aside, we think in this case Hubbard's back pay request constitutes an equitable remedy. In *Terry,* the Supreme Court considered two ways the plaintiffs' action for back pay might be equitable: if it was restitutionary or if it was incidental to or intertwined with injunctive relief. 110 S.Ct. at 1348. Both of these factors apply here. Hubbard was denied a specific job and the pay that goes with it. An award of instatement and back pay gives Hubbard the precise thing to which he was entitled and therefore constitutes specific restitution. *See* RESTATEMENT OF RESTITUTION § 4 (1937) (equity awards the specific thing taken). Although such an award involves money, that alone does not take it outside equity. *See* DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES 135 (1973) ("[o]ccasionally a money award is also a specie remedy"), *quoted in Bowen v. Massachusetts,* 487 U.S. at 895, 108 S.Ct. at 2732.

In arguing that back pay cannot be restitution, the dissent, in our opinion, makes two errors. First, it assumes that restitution can only derive from unjust enrichment. Unjust enrichment, however, defines only half the field.

> Lawyers use the word "restitution" in at least two senses. "Restitution" means recovery based on and measured by unjust enrichment. It also means restoration in kind of a specific thing. Both usages are part of any complete definition of restitution. [George] Palmer [author of the leading restitution treatise] and the *Restatement [of Restitution]* use the word both ways....

Douglas Laycock, *The Scope and Significance of Restitution,* 67 TEX.L.REV. 1277, 1279 (1989) (footnotes omitted). It is in the sense of restoration that Dobbs' statement that money can be a specie remedy is best understood. Second, the dissent misconceives the "thing taken." By stating that back pay "compensates for the time [Hubbard] was wrongfully kept off the job," the dissent has conceived of the thing taken solely as the right to work. By analogy to a specific performance action, the dissent's hypothetical employment contract contains only one term—that Hubbard shall work for the EPA. Such a contract, although possibly not void for lack of consideration, is surely not what either party would have imagined and is surely not what Hubbard

---

8. We have identified one case where the court has treated back pay as legal damages. We believe, however, that it does not present the situation reflected here or in the cases above. In *Sester v. Novack Investment Co.,* 638 F.2d 1137 (8th Cir.), *modified,* 657 F.2d 926 (8th Cir.) (en banc), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981), the Eighth Circuit held that the plaintiff was entitled to a jury trial on his 42 U.S.C. § 1981 reverse discrimination suit. The plaintiff sought back pay and damages, but not reinstatement. The court found that the back pay sought was legal damages. *Id.* at 1142 ("We conclude that back pay or lost wage determinations are inherently in the nature of legal damages."). The Eighth Circuit seems to have questioned that case, however. *See Brewer v. Parkman,* 918 F.2d 1336 (8th Cir.1990), *vacated and modified,* 938 F.2d 860 (8th Cir.1991) (en banc). In *Brewer,* the plaintiff had sought back pay incidental to reinstatement and the court characterized the award as equitable. 918 F.2d at 1343.

would have received but-for EPA's unconstitutional actions. The "thing taken" must have been both the position *and* the pay. Our interpretation does not eliminate the concept of compensatory damages. Here, they might have been damages for stigmatic injury, costs incurred for retraining or relocation, or other consequential injuries. Simply because the restitutionary measure equals the primary compensatory element does not cause it to lose its character as restitution. *See* Laycock, *supra*, at 1285–86.

The money that Hubbard seeks would not be awarded to compensate for an infringement of an intangible right, as in *Bivens* actions. Rather, it is intertwined with, and flows directly from, an award of instatement—relief that can only be granted by a court in equity.

### B. *Waiver of Sovereign Immunity*

Our conclusion that a back pay award to Hubbard would constitute equitable relief largely disposes of any question regarding sovereign immunity. Section 702 of the APA waives that immunity for all suits seeking specific relief and we think an equitable award of back pay clearly qualifies.

The Supreme Court's decision in *Bowen v. Massachusetts* makes clear that section 702's proviso excluding money "damages"

did not mean that no monetary relief could be awarded. 487 U.S. at 891–901, 108 S.Ct. at 2730–31. As noted above, the Court used an equitable award of back pay as an example of the relief that would be permitted under section 702.[9] Since *Bowen*, two courts have stated, albeit one in dicta, that an award of back pay would fall within section 702. *Ulmet v. United States*, 888 F.2d 1028, 1030–31 (4th Cir.1989) (finding jurisdiction in the district court to award back pay, although sanctioning its decision to defer to the Claims Court); *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1381 (10th Cir.1990) (dicta), *cert. denied*, —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); *see also Gleason v. Malcom*, 718 F.2d 1044, 1048 (11th Cir. 1983) (in rejecting a First Amendment damages claim, the court wrote: "As a federal employee, she could have sought equitable relief, *i.e.*, reinstatement and back pay, pursuant to the Administrative Procedure Act"); *Nixon v. United States*, 938 F.2d 239, 251 n. 4 (D.C.Cir.1991) (Edwards, J., concurring in part and dissenting in part) ("Moreover, in the wake of the Supreme Court's decision in *Bowen*, it would appear that even had Nixon sought back pay in this action, his suit would still not be one for 'money damages' within the meaning of 5 U.S.C. § 702.").[10]

**9.** The dissent suggests that this statement merely establishes that back pay often is awarded together with reinstatement. The Title VII cases do not see it this way, for they type back pay as relief more akin to reinstatement than to damages. Additionally, several courts have characterized back pay as specific relief. *See Bowen,* 487 U.S. at 893, 108 S.Ct. at 2731 ("an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with back pay"); *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 751, 96 S.Ct. 1251, 1258, 47 L.Ed.2d 444 (1976) ("the District Court declined, however, to grant the unnamed members of classes 3 and 4 any other specific relief sought, which included an award of backpay"); *Riddle v. Cerro Wire & Cable Group, Inc.,* 902 F.2d 918, 922 (11th Cir.1990) ("The EEOC's complaint sought specific relief for Riddle in the form of backpay and promotion."); *Ward v. Arkansas State Police,* 653 F.2d 346, 348 (8th Cir.1981) ("The consent decree ... established guidelines for back pay and other specific relief"); *McClain v. Wagner Elec. Corp.,* 550 F.2d 1115, 1118 (8th Cir.1977) ("the settlement ... gave no specific relief such as back pay"); *Unit-*

*ed States v. N.L. Indus., Inc.,* 479 F.2d 354, 378 (8th Cir.1973) ("The Government requests specific relief for individual applicants, including backpay differentials"); *City of Fort Smith v. Driggers,* 305 Ark. 409, 808 S.W.2d 748, 753 (1991) (the "complaint sought specific relief in the form of promotion and back pay"); *Eureka Teacher's Ass'n v. Board of Educ.,* 202 Cal. App.3d 469, 247 Cal.Rptr. 790, 794 (1988) ("'Back pay clearly is specific monetary relief incidental to the requested orders that appellant be hired and that respondents be enjoined from discriminating against him.'") (quoting *Snipes v. City of Bakersfield,* 145 Cal.App.3d 861, 193 Cal.Rptr. 760, 765 (1983)). *But see General Telephone Co. v. EEOC,* 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980) ("EEOC can secure specific relief, such as hiring or reinstatement, constructive seniority, or damages for backpay"). *General Telephone* might be distinguished because EEOC, acting on behalf of employees and the general public, is not suing for back pay owed it.

**10.** We recognize that, before *Bowen*, several courts found that back pay awards do not fall

If *Bowen*'s use of back pay as an illustration is not sufficiently persuasive, we think the reasoning of that decision compels a finding that back pay is within section 702's waiver. By its terms, section 702 waives sovereign immunity for all relief other than "money damages." The *Bowen* Court relied heavily on this circuit's decision in *Maryland Dept. of Human Resources v. Dept. of Health & Human Servs.*, 763 F.2d 1441 (D.C.Cir.1985), to construe that term and held that it did not encompass all monetary relief. Money given "to substitute for a suffered loss" constituted damages whereas " 'attempt[s] to give the plaintiff the very thing to which he was entitled' " were specific relief and within the waiver. *See Bowen*, 487 U.S. at 895, 108 S.Ct. at 2732; *Maryland Dept. of Human Resources*, 763 F.2d at 1446 (quoting D. DOBBS, *supra*, at 135). "The fact that in the present case it is money rather than in-kind benefits ... cannot transform the nature of the relief sought—specific relief, not relief in the form of damages." 487 U.S. at 895, 108 S.Ct. at 2733; 763 F.2d at 1446. No less than the funds restored to Massachusetts in *Bowen*, we think Hubbard's back pay, being part of the very thing EPA unconstitutionally withheld, constitutes specific relief.[11]

Reviewing the legislative history of section 702, the *Bowen* Court noted that Congress intended "to eliminate the sovereign immunity defense in all *equitable* actions for specific relief against a Federal agency or officer acting in an official capacity." H.R.REP. No. 1656, 94th Cong., 2d Sess. 9 (1976); S.REP. No. 996, 94th Cong., 2d Sess. 8 (1976), *quoted in Maryland Dept. of Human Resources*, 763 F.2d at 1447; *Bow-*

en, 487 U.S. at 899, 108 S.Ct. at 2734 (emphasis added). The dissent, in distinguishing between equitable relief and specific relief, glosses over this statement from both committees. Both *Bowen* and *Maryland Dept. of Human Resources* applied this statement to a list of actions contemplated by the committee which included not only "Federal grant-in-aid programs," but also "agricultural regulations, *governmental employment*, tax investigations, postal-rate matters, administration of labor legislation, control of subversive activities, [and] food and drug regulation." H.R.REP. No. 1656 at 9; S.REP. No. 996 at 8 (emphasis added).

We agree with the dissent that little in the legislative history of section 702 points toward including back pay awards within the waiver. The question may not have occurred to the committee given the existence of the Back Pay Act. Nonetheless, despite the dissent's reference to "the hard nosed rules of statutory construction," *nothing* in the statute or the legislative history *excludes* back pay recoveries. The interpretation question is whether back pay constitutes "money damages" within the meaning of section 702's exclusion. The Supreme Court in *Bowen* held that an award of money constituted "money damages" only when the money "substitute[s] for a suffered loss." *Bowen*, 487 U.S. at 894, 108 S.Ct. at 2732 (quoting *Maryland Dept. of Human Resources*, 763 F.2d at 1446 (quoting D. DOBBS, *supra*, at 135)). Here, the back pay does not substitute for any damage, such as pain or defamation, but is the exact thing Hubbard should have received. Second, the dissent's statutory construction argument, being built on si-

---

within section 702. Because these decisions were issued before *Bowen*, and were premised on an assumption that *all* awards of monetary relief fell outside the waiver, we do not view these cases as dispositive of the issue before us. In fact, the Government does not even seek to rely on them. *See Hostetter v. United States*, 739 F.2d 983, 985 (4th Cir.1984) (dicta); *McCartin v. Norton*, 674 F.2d 1317, 1321–22 (9th Cir.1982); *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1139–40 (5th Cir.1980), *rev'd on other grounds*, 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); *Glines v. Wade*, 586 F.2d 675, 681–82 (9th Cir.1978), *rev'd on other grounds*, 444

U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Cook v. Arentzen*, 582 F.2d 870, 874–75 (4th Cir.1978). *Cf. Ulmet v. United States*, 888 F.2d 1028, 1030 (4th Cir.1989) (*Cook v. Arentzen* not good law after *Bowen* ).

**11.** The dissent asserts that Dobbs is "quite clear that back pay or lost wages is compensatory relief in the nature of damages." To the extent that Dobbs' view controls either *Bowen* or ourselves, Dobbs may be read to embrace the idea that back pay may be specific relief. Given that Dobbs recognizes the restitutionary/substitutionary dichotomy as central to specific relief,

lence, is actually based on the cited canon of construction that sovereign immunity waivers should be narrowly construed. To the extent canons are reliable in statutory interpretation, *see, e.g.*, WILLIAM N. ESKRIDGE & PHILIP P. FRICKEY, CASES AND MATERIALS ON LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 689 (1988) (noting that canons may be used on any side of a construction argument), "remedial statutes should be broadly construed" might be more appropriate given Congress' expressed intent that plaintiffs with meritorious claims against the government not be barred by sovereign immunity. *See* H.R.REP. No. 1656 at 8, 9; S.REP. No. 996 at 7, 8: ("enactment of [the bill] is 'urgent' in order to remove 'the unnecessary injustice caused by sovereign immunity'" (quoting Professor Kenneth Davis); "the time now [has] come to eliminate the sovereign immunity defense in all equitable actions for specific relief").[12]

The Government contends that, under *Bowen,* money awarded can only be specific relief when there is a statutory requirement that those monies be paid. In other words, the Government seems to argue that equitable relief can never include money unless the money sought is given pursuant to a specific statutory authorization. But of course this makes no sense in light of the Court's reference to "back pay" as equitable relief and the legislative history which lists "government employment" among the equitable actions for which specific relief may be granted. Although *Bowen* refers to the Medicaid statute which

Massachusetts used to assert that payments had been wrongfully withheld, the opinion of the Court focuses on the dichotomy between substitutionary and restitutionary relief. *See, e.g.,* 487 U.S. at 901, 108 S.Ct. at 2735. The Court's reasoning in this regard appears to draw on the equitable maxim "Equity regards that as done which ought to be done." *See generally* GEORGE L. CLARK, PRINCIPLES OF EQUITY § 20 (1919); 1 MELVILLE M. BIGELOW, JOSEPH STORY'S COMMENTARIES ON EQUITY JURISPRUDENCE 68–69 (13th ed. 1886). An equity court seeks to restore the plaintiff to the position she would have been in had the defendant's illegal action never taken place. *Cf. Jacksonville Port Auth. v. Adams,* 556 F.2d 52, 56–57 (D.C.Cir.1977) (holding that District Court may award money due under a statute even though time for disbursement had expired). Had EPA acted constitutionally, Hubbard would have received the pay in question.

Additionally, in *Bowen* and *Maryland Dept. of Human Resources,* the statutory entitlement was necessary to create the cause of action. The grant-in-aid statutes, *and only the statutes,* provided the grounds on which the plaintiffs could complain that they, in the words of section 702, had "suffer[ed] a legal wrong ... or [been] adversely affected within the meaning of a relevant statute." 5 U.S.C. § 702 (1988). Here, the First Amendment provides the cause of action and, as noted above, the Supreme Court has held that even plaintiffs with no prior property interest in their employment cannot be discharged for exercising those rights. As the resolution of

---

the cited passages admit of that interpretation. Dobbs' statement of the measure of damages, what the contract would have brought the employee, is exactly consistent with our interpretation. *See also* ROBERT S. THOMPSON & JOHN A. SEBERT, JR., REMEDIES: DAMAGES, EQUITY AND RESTITUTION § 2.02 (1983) (Specific performance is specific relief and award of contract price is specific performance.); EDWARD D. RE, CASES AND MATERIALS ON REMEDIES 310 (1987) (same). As we noted previously, that lost wages is a damage measure does not mean it is not also specific relief.

12. Contrary to the dissent's claim, the Senate Judiciary Committee had before it at least two examples where sovereign immunity was used to bar specific monetary relief, including back pay. The dissent contends that the "governmental employment" cases cited to the Senate Judi-

ciary Committee by Professor Roger Cramton did not include any cases where sovereign immunity barred a back pay award. One of the cases did, however, involve a claim for lost wages. *See Leber v. Canal Zone Cent. Labor Union,* 383 F.2d 110, 114–15 (5th Cir.1967) (In concluding that the Secretary of the Army was an indispensable party, the court wrote: "The Secretary must authorize the payment of any former differential. He must order the payment to employees of any monetary losses resulting from invalid regulations."), *cert. denied,* 389 U.S. 1046, 88 S.Ct. 769, 19 L.Ed.2d 838 (1968). Additionally, in the law review article advocating the amendment to section 702, Professor Cramton, in the same footnote discussing the cases cited to the committee, noted another case where sovereign immunity barred the recovery of specific monetary relief. *See* Roger C.

the fourth prong of the *Pickering* test necessarily shows, only EPA's violation of Hubbard's First Amendment rights prevented him from being employed and paid as a criminal investigator.

That the First Amendment creates the rights sued upon also points up the error in the District Court's ruling. Relying on *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the District Court held that it did not have the power to award back pay, because, it said, "[t]he established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it." 739 F.Supp. at 655. *Testan*, however, concluded only that no relief was due because there was no statute covering failures to upgrade job classifications. The plaintiffs in *Testan* asserted no cause of action except those based on the Back Pay Act and the Classification Act. And, as the Court noted, neither statute created a substantive right whose breach makes the United States liable for pay lost through allegedly improper classifications. *See* 424 U.S. at 398–407, 96 S.Ct. at 953–57. Here, however, the First Amendment gives that substantive right.[13]

Finally, to the extent that statutory definition of the *amount* due may be necessary to characterize monetary awards as specific relief, we find no difficulty here. Hubbard's grade and step, and hence pay, are governed by federal employment regulations. And, to the extent the District Court is required to exercise discretion, we think it no different than interpreting the Medicaid statute or determining back pay in a Title VII dispute.

Cramton, *Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant,* 68 Mich.L.Rev. 387, 423 n. 161 (1970); *American Guaranty Corp. v. Burton,* 380 F.2d 789, 790–91 (1st Cir. 1967) (sovereign immunity barred recovery of funds taken from debtor's estate, pursuant to statute, and deposited in the Referee's Salary and Expense fund).

13. The *Bowen* Court refers to the Back Pay Act solely as an illustration of the type of action for money that gives rise to the exclusive jurisdic-

## V. CONCLUSION

In sum, we find that EPA violated Michael Hubbard's First Amendment rights when it refused to hire him as a criminal investigator. He is, therefore, entitled to instatement and back pay as if he had been hired. Furthermore, the District Court on remand should entertain an attorneys' fees petition under 28 U.S.C. § 2412(d).

WALD, Circuit Judge, concurring in part and dissenting in part:

I join the majority in affirming the district court's ruling that the Environmental Protection Agency ("EPA") acted unlawfully in failing to hire Hubbard, and in reversing the district court's refusal to consider Hubbard's claim for attorney's fees. I respectfully dissent, however, from the majority's holding that 5 U.S.C. § 702 waives the sovereign immunity of the United States as to Hubbard's claim for back pay.

Section 702 waives the sovereign immunity of the United States in actions in which the aggrieved party seeks "relief other than money damages." 5 U.S.C. § 702 (1988). Relying on the Supreme Court's ruling in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), and on a series of cases that classify back pay for various purposes as "equitable" relief, the majority reasons that back pay pursuant to an order of instatement is not "money damages" and therefore does not fall outside the limits of § 702's waiver of sovereign immunity. The majority's argument is by no means implausible, and indeed awarding Hubbard back pay would work no injustice in light of the court's findings as to EPA's unconstitutional actions. The obstacle to my assent is that I do not believe that § 702, properly construed, encompasses claims for monetary

tion of the Claims Court. The phrasing the Court employs relates only to the test for Claims Court jurisdiction—"whether the ... legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Bowen,* 487 U.S. at 906 n. 42, 108 S.Ct. at 2738 n. 42 (quoting *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1009 (1967)). Furthermore, our decision here does not increase duplication with the Back Pay Act. Hubbard, because he was not an employee at the time the action was taken against him, was not covered by the Back Pay Act. *See* 5 U.S.C. § 5595(a)(2)

awards of back pay as a remedy for constitutional torts.[1]

The text of § 702 specifically excludes claims for "money damages" from its waiver of sovereign immunity. The legislative history of § 702 makes clear that it "withdraw[s] the defense of sovereign immunity in actions seeking relief other than money damages, *such as an injunction, declaratory judgment, or writ of mandamus.*" H.R.Rep. No. 1656, 94th Cong., 2d Sess. 4 (1976) (emphasis supplied). The House and Senate Reports say unequivocally that the waiver is "limited only to actions *of this type for specific relief.*" *Id.* (emphasis supplied); S.Rep. No. 996 at 4.[2] Because back pay or lost wages traditionally have been viewed as money damages and not specific relief, *see* Dan B. Dobbs, *Handbook on the Law of Remedies* 924–27, 929–31 (1973) (*"Dobbs on Remedies"* ); Arthur G. Sedgwick, *A Treatise on the Measure of Damages* 3, 1343 (9th ed. 1920), Hubbard's back pay claim falls within the "money damages" exception to the § 702 waiver.

Nothing in the legislative history of the 1976 amendments to § 702—two committee reports and two sets of hearings [3]—suggests otherwise. The majority notes only that both committee reports listed "governmental employment" as one of the areas that would be affected by the waiver of sovereign immunity in amended § 702. Majority opinion ("Maj. op.") at 468. The reference appears to have originated in Professor Cramton's testimony before the Senate Judiciary Committee as part of a general reference to cases "challenging government regulatory and enforcement activity." *Sovereign Immunity: Hearing before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary,* 91st Cong., 2d Sess. 120 (1970).[4] There is, however, nothing to indicate that this oblique reference to a general category of cases that could be affected by the amendment was meant to indicate that claims for back pay, as opposed to injunctive or declaratory re-

---

(1988); *Testan,* 424 U.S. at 405–07, 96 S.Ct. at 956–57. Any duplication based on permitting an equitable action to federal employees is based on the clear law of this circuit and beyond question at this point. *See Spagnola,* 859 F.2d at 229–30.

**1.** Indeed, a *Bivens* action, where available, is the usual damages remedy for such constitutional torts. Earlier incarnations of this action, however, found such a remedy unavailable to Hubbard. *See Spagnola v. Mathis,* 859 F.2d 223, 230 (D.C.Cir.1988) (*en banc* ).

**2.** *See also* H.R.Rep. No. 1656 at 5 ("[t]hese actions usually take the form of a suit for injunctive, declaratory or mandamus relief"); S.Rep. No. 996 at 4 (same); H.R.Rep. No. 1656 at 20 ("[the proposed amendment will not] expos[e] the Government to new liability for money damages"); S.Rep. No. 996 at 19 (same); *Sovereign Immunity: Hearing before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary,* 91st Cong., 2d Sess. 30–31 (1970) (noting that "[t]he explicit exclusion of monetary relief makes clear that sovereign immunity is abolished only in actions for specific relief (injunction, declaratory judgment, mandatory relief, quiet title and ejectment)") (prepared comments of Professor Roger C. Cramton). And, as Professor Kenneth Davis stated in his Senate testimony:
> [the] principal effect [of the proposed amendment to § 702] is to allow suits for specific relief.... Perhaps ninety per cent of the cases affected will be suits for injunction or

declaratory judgment or for both, and perhaps most of the rest will be suits for relief in the nature of mandamus. But all other specific relief is covered, including specific performance, quieting title, ejectment, habeas corpus, and all other forms of specific relief. *Id.* at 222.

**3.** *See* H.R.Rep. No. 1656, 94th Cong., 2d Sess. (1976); S.Rep. No. 996, 94th Cong., 2d Sess. (1976); *Sovereign Immunity: Hearing before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary,* 91st Cong., 2d Sess. (1970); *Administrative Procedure Act Amendments of 1976: Hearings before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary,* 94th Cong., 2d Sess. (1976).

**4.** Professor Cramton presented a "sampling of recent cases ... [where] sovereign immunity has been a serious issue," including several cases relating to "government employment." *Sovereign Immunity: Hearing before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary,* 91st Cong., 2d Sess. 120, 122 (1970) (citing *Leber v. Canal Zone Cent. Labor Union & Metal Trades Council,* 383 F.2d 110 (5th Cir.1967), *cert. denied, Bramlett v. Leber,* 389 U.S. 1046, 88 S.Ct. 769, 19 L.Ed.2d 838 (1968); *Mulry v. Driver,* 366 F.2d 544 (9th Cir.1966); *Manhattan–Bronx Postal Union v. Gronouski,* 350 F.2d 451 (D.C.Cir. 1965), *cert. denied, Manhattan–Bronx Postal Union v. O'Brien,* 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966)).

lief, would be excepted from the exception for money damages.[5]

Moreover, one of the law review articles cited in the House Report, *see* H.R.Rep. No. 1656 at 8 n. 21, is devoted entirely to the limitation sovereign immunity placed on effective prosecution of federal employment discrimination cases. *See* Charles F. Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases,* 10 Harv. C.R.–C.L.L.Rev. 322 (1975). Yet, the article concludes only that *"injunctive* relief in an employment discrimination case ... should not be barred by sovereign immunity principles." *Id.* at 366 (emphasis supplied).

As the majority recognizes, Maj. op. at 467 n. 10, the weight of authority before *Bowen* indicated that § 702 did not waive the sovereign immunity of the United States as to claims for back pay. *See, e.g., Hostetter v. United States,* 739 F.2d 983, 985 (4th Cir.1984) (dicta); *McCartin v. Norton,* 674 F.2d 1317, 1321–22 (9th Cir.1982); *Sheehan v. Army & Air Force Exch. Serv.,* 619 F.2d 1132, 1139–40 (5th Cir. 1980), *rev'd on other grounds,* 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982); *Glines v. Wade,* 586 F.2d 675, 681–82 (9th Cir.1978), *rev'd on other grounds,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980); *Cook v. Arentzen,* 582 F.2d 870, 874–75 (4th Cir.1978). My colleagues argue, however, that *Bowen* changed all that by expressly and implicitly including back pay within the category of "monetary relief" that does not run afoul of the "money damages" exception to § 702's waiver.[6]

Certainly nothing in the *holding* of *Bowen* indicates that back pay falls within the waiver of sovereign immunity in § 702. Drawing upon Judge Bork's exhaustive prior interpretation of § 702, the *Bowen* Court reiterated that the reference to "other than money damages" in § 702 invoked the basic distinction in the law of remedies between "damages," which "normally refers to a sum of money used as compensatory relief," and "specific remedies," which "give the plaintiff the very thing to which he was entitled." *Bowen,* 487 U.S. at 895, 108 S.Ct. at 2732 (quoting *Maryland Dept. of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441, 1446 (1985)) (internal quotations and citations omitted). While noting that money is most often awarded as compensation for a wrong and is therefore classifiable as "damages"—and not within § 702's waiver—the Court also recognized that occasionally an award of money may constitute a specie remedy that *would* fall within the § 702 waiver. *Id.* The Court cited as examples of such exceptions to "money damages" judicial orders to specifically perform a contract to borrow money, to make future monthly support payments, or to fulfill a promise to pay a money bonus under a royalty contract. *Id.*

In *Bowen* itself, the federal government was withholding funds to which the state of Massachusetts claimed it was rightfully entitled by law. The purpose of the state's suit, the Court held, was to recover those funds and thus it constituted a suit for specific relief, or, as our court had earlier dubbed it, "specific monetary relief." *Id.* at 899–900, 108 S.Ct. at 2735. In sum, the Court concluded that

---

**5.** The majority suggests that *Leber, supra,* involved a claim for lost wages and thus supports the notion that the amended § 702 waives sovereign immunity for similar claims for back pay. Maj. op. at 468–69 n. 12. Both the appellate and trial court decisions in *Leber* are quite explicit, however, that the plaintiffs sought declaratory and injunctive relief, not lost wages. *Canal Zone Cent. Labor Union & Metal Trades Council v. Fleming,* 246 F.Supp. 998, 999 (D.C.Z.1965) ("[t]his action was begun ... by the filing of a complaint praying for a declaratory judgment that certain regulations are ... invalid and for an injunction restraining the *further* implementation of the regulations") (emphasis supplied); *Leber,* 383 F.2d at 113 ("[t]his appeal is from a

decision ... declaring that certain regulations ... are invalid ... and enjoining the ... enforc[ement of] these regulations"). The passage cited by the majority noting that the Secretary of the Army "must order the payment to employees of any monetary losses resulting from invalid regulations," 383 F.2d at 114–15, refers to an obligation imposed on the Secretary by federal law, 383 F.2d at 115 & n. 9, not to the particular relief sought by the plaintiff employees.

**6.** Despite dicta from two other circuits, *see* Maj. op. at 466–67, we will be the first circuit to hold that § 702 waives sovereign immunity for claims of back pay.

[t]he State's suit ... is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.

*Id.* at 900, 108 S.Ct. at 2735 (emphasis in original).

The *holding* of *Bowen* thus offers no support for Hubbard's claim that § 702 waives the sovereign immunity of the United States for back pay. Hubbard's suit is not one to enforce a statutory or constitutional mandate that he be paid a specified sum of money. Nor does Hubbard seek specific performance of an agreement to pay him a specified sum of money. The constitutional right that Hubbard is entitled to enforce is his right not to be discriminatorily barred from the job he sought. The "specific relief" that Hubbard seeks and was granted by the district court is a right to perform as a criminal investigator at EPA. *See generally Dobbs on Remedies* at 924–31 (discussing separately the specific remedy of reinstatement and the damages remedy of lost wages). An award of back pay would be the classic case of "money damages" to compensate him for the time he was wrongfully kept off the job.

The only support for Hubbard in *Bowen* is a single sentence of dicta suggesting that an award of back pay may be included within an order for specific relief. In making the noncontroversial point that not all monetary awards are "damages," the Court stated that

[o]ur cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with back pay, or for the "recovery of specific property or monies, ejectment from land, or injunction either

directing or restraining the defendant officer's actions."

*Id.* at 893, 108 S.Ct. at 2731–32 (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949)) (emphasis deleted). It is admittedly unclear from that laconic phrase whether the Court was labelling back pay as a form of specific relief, or simply stating the unremarkable proposition that courts often include a back pay award along with the specific remedy of reinstatement in order to afford complete relief. *See generally Dobbs on Remedies* at 84 (noting that in a fully merged system such as that in the federal courts, a single court adjudicates both legal and equitable claims). The majority argues that the Court meant that an award of back pay *itself* is a form of specific relief for purposes of § 702; I am doubtful that that was the intended meaning as it would contradict the existing law and the academic authorities that the Court itself cites later in the *Bowen* opinion. Thus, I do not find this one statement to be dispositive on the issue of whether § 702 waives the sovereign immunity of the United States as to claims for back pay.

*Bowen* cites *Dobbs on Remedies* for the basic distinction between compensatory damages and specific relief. *Id.* at 895, 108 S.Ct. at 2732. Yet Dobbs' treatise is quite clear that back pay or lost wages is compensatory relief in the nature of damages. *See Dobbs on Remedies* at 924–27, 69 n. 18. Additionally, classifying back pay as specific, as opposed to compensatory, relief contradicts the *Bowen* Court's repeated description of the Back Pay Act, 5 U.S.C. § 5596, as a law that provides *compensation* for past injury. 487 U.S. at 901 n. 31, 904 n. 39, 906 n. 42, 108 S.Ct. at 2735 n. 31, 2737 n. 39, 2738 n. 42. Indeed, the Court's several references to the Back Pay Act tend to deflate the notion that the Court was ruling that § 702 waives sovereign immunity as to back pay, for such a holding would render the Back Pay Act itself largely superfluous.[7]

---

**7.** *See United States v. Testan,* 424 U.S. 392, 404, 96 S.Ct. 948, 956, 47 L.Ed.2d 114 (1976) (noting that the Back Pay Act "expressly provide[s]

money damages as a remedy against the United States in carefully limited circumstances").

The majority also argues from other areas of the law where back pay has been classified as equitable relief that it is not "money damages" for purposes of federal sovereign immunity. Maj. op. at 463–66. But I fear the majority misconstrues the essential inquiry in these contexts as they contrast with this one. Regardless of how back pay is treated for other purposes, such as the Seventh Amendment right to jury trial, the crucial issue here is what Congress intended by the phrase "other than money damages" when it amended 5 U.S.C. § 702. According to *Bowen* itself, Congress was drawing the traditional distinction between compensatory and specific relief. *Bowen*, 487 U.S. at 895, 108 S.Ct. at 2732. And, regardless of what courts call it in different circumstances, there is no escaping the fact that back pay is designed to compensate an aggrieved party.

This is surely the case with regard to the antidiscrimination remedies of Title VII of the Civil Rights Act of 1964. The majority relies on *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), for the proposition that back pay is deemed an equitable remedy under Title VII. Maj. op. at 463. The language of *Albemarle* makes clear, however, that back pay under Title VII is designed to "compensat[e]" or "make whole" the victim of illegal discrimination. *Id.* at 418–19, 95 S.Ct. at 2372.

> [T]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The

injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.

*Id.* (quoting *Wicker v. Hoppock*, 6 Wall. 94, 99, 18 L.Ed. 752 (1867)).[8] Likewise, the majority cites, among other Title VII cases, *United States v. N.L. Industries*, 479 F.2d 354, 378 (8th Cir.1973), for the proposition that back pay is a form of specific relief. Maj. op. at 466, n. 9. The *N.L. Industries* court itself, however, noted that back pay "is compensation for the tangible economic loss resulting from an unlawful employment practice." *Id.* at 379 (internal quotation omitted). Indeed, the use of the label "equitable" to describe the mixed law and equity remedial scheme of Title VII has prompted one scholar to comment that "equitable remedies in the Title VII context mean something quite different than traditional notions of equity." Minna J. Kotkin, *Public Remedies for Private Wrongs: Rethinking the Title VII Back Pay Remedy*, 41 Hastings L.J. 1301, 1375 (1990).[9] Thus, whether or not back pay may, on occasion, be called an "equitable" remedy or even "specific relief" under Title VII, it has never been seriously contested that its essence is "money damages" to compensate for injuries suffered.[10]

As the majority points out, back pay has also on occasion been called a form of "restitution." Maj. op. at 462, 465–66. *See Curtis v. Loether*, 415 U.S. 189, 197, 94 S.Ct. 1005, 1010, 39 L.Ed.2d 260 (1974) (dicta) (back pay under Title VII considered to be a form of restitution); *cf. Chauffeurs, Teamsters and Helpers, Local No. 391 v.*

---

8. The *Albemarle* Court's use of the term "equitable remedy" in relation to back pay clearly referred to the courts' equitable discretion under Title VII whether or not to award back pay at all. *See* 422 U.S. at 414–18, 95 S.Ct. at 2370.

9. The same point can be made about *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), Maj. op. at 464–65, which held that pursuant to the "historic power of equity to provide complete relief," a district court could award lost wages to private employees discharged in violation of the Fair Labor Standards Act. 361 U.S. at 292, 80 S.Ct. at 335. This equitable power of the court, however, in no way obscures the basic fact that the

award was "compensatory" in nature. *Id.* at 293, 80 S.Ct. at 336.

10. *See, e.g.,* Arthur G. Sedgwick, *A Treatise on the Measure of Damages* 3 (1920) (noting that "[e]quity ... gives *specific relief* by decreeing the very thing to be done which was agreed to be done.... But, as a general rule, it refrains from awarding pecuniary reparation for damage sustained") (emphasis supplied); *id.* at 1343 (under the heading "Damages for wrongful discharge," noting that "[t]he general rule in cases of wrongful discharge ... is that the plaintiff has a right to recover the stipulated wages for the full time"); *see also Dobbs on Remedies* at 924–27, 929–31.

*Terry,* 494 U.S. 558, 110 S.Ct. 1339, 1348, 108 L.Ed.2d 519 (1990) (back pay under the Labor Management Relations Act was not restitutionary where suit was against plaintiffs' union as opposed to plaintiffs' employer). This designation, as well as deviating from the classical definition of restitution as a remedy designed to undo unjust enrichment of the defendant without regard to the loss suffered by the plaintiff, *see Restatement of Restitution* general scope note at 1 (1937); *Dobbs on Remedies* at 1–2; David A. Webster, *Beyond Federal Sovereign Immunity,* 49 Ohio St.L.J. 725, 736 (1988) (discussing the remedy of restitution and its application to the Supreme Court's ruling in *Bowen v. Massachusetts* ), provides no counterpoint either to Congress' direct evidence that amended § 702 was not to include any form of money damages.[11]

Like Sherlock Holmes' dog that did not bark, it is hard to imagine that the long and hard-fought battle for the § 702 waiver of sovereign immunity would have been waged without any mention of back pay as an exception to the "money damages" bar. *See, e.g.,* Roger C. Cramton, *Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant,* 68 Mich. L.Rev. 387 (1970); Charles F. Abernathy,

*Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases,* 10 Harv.C.R.–C.L.L.Rev. 322 (1975); Clark Byse, *Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus,* 75 Harv.L.Rev. 1479 (1962). Such a conclusion is particularly puzzling in view of the Supreme Court's oft-repeated insistence that "we must construe waivers strictly in favor of the sovereign." *Library of Congress v. Shaw,* 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986). If back pay awards are indeed waived by § 702, they are truly the "stealth exception" to sovereign immunity.

If wishes could trump the hard-nosed rules of statutory construction, I would happily join my colleagues in reversing the district court's denial of Hubbard's claim for back pay. Unfortunately, I do not construe *Bowen* 's dicta as authoritatively ruling that Congress intended the waiver in § 702 to encompass claims for back pay. I therefore must dissent from that part of the majority's otherwise excellent opinion.

---

**11.** Professor Laycock, upon whom the majority relies for the proposition that restitution also encompasses "restoration in kind of a specific thing," Maj. op. at 465–66, nowhere says that an award of back pay falls under this category of restitution:

> "Restitution" is sometimes used in a third sense—to restore the value of what plaintiff lost.... But restitution of the value of what plaintiff lost is simply compensatory damages. Used in this sense, "restitution" loses all utility as a means of distinguishing one body of law from another. Restitution must be distinguished from compensation, either by its focus on restoration of the loss in kind or by its focus on defendant's gain as a measure of recovery.

Douglas Laycock, *The Scope and Significance of Restitution,* 67 Tex.L.Rev. 1282–83 (1989). An award of back pay to Hubbard grants him the "value" of the job for which he was wrongfully excluded and is thus compensatory damages, not "in kind" restitution.

Indeed, the Supreme Court has expressly rejected attempts in other contexts to label compensatory damages as "equitable restitution" for purposes of escaping the Eleventh Amendment:

> But that portion of the District Court's decree which petitioner challenges ... requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard. While the Court of Appeals described this retroactive award of monetary relief as a form of "equitable restitution," it is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action. It is measured in terms of a monetary loss

ORDER

March 2, 1992.

Before MIKVA, Chief Judge, WALD, EDWARDS, RUTH B. GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.

The Suggestion For Rehearing *En Banc* of appellee/cross-appellant and the response thereto have been circulated to the full Court. The taking of a vote was requested. Thereafter, a majority of the judges of the Court in regular active service voted in favor of the suggestion on the question of whether "the Administrative Procedure Act, 5 U.S.C. § 702 (1988), ... waives sovereign immunity for ... back pay." *Hubbard v. EPA*, 949 F.2d 453, 462 (D.C.Cir.1991). Upon consideration of the foregoing it is

ORDERED, by the Court *en banc*, that the suggestion is granted in part and denied in part. The aforementioned remedy issue will be considered and decided by the Court sitting *en banc*.

It is Further Ordered, by the Court *en banc*, that the injunctive relief ordered by the District Court and affirmed by a panel of this court, 949 F.2d at 462 ("Hubbard clearly is entitled to full equitable relief. Both the prior panel and *en banc* decisions ... held that the court could grant equitable relief. *Hubbard*, 809 F.2d at 11–12; *Spagnola*, 859 F.2d at 229–30."); *id.* at 470 ("[h]e is, therefore, entitled to instatement"); *Hubbard*, 735 F.Supp. 435, 440 (D.D.C.1990), *on reconsideration*, 739 F.Supp. 654, 657 (D.D.C.1990), *clarified*,

1990 WL 134824, 1990 U.S. Dist. LEXIS 11661 (D.D.C. Sept. 5, 1990) ("The Court intends for plaintiff to receive a position and salary equivalent to that to which he would have advanced by the date of his instatement, had he not been denied a position in 1982 for constitutionally impermissible reasons."), is not disturbed by this order and is not subject to *en banc* review.

A future order will govern further proceedings.

---

resulting from a past breach of a legal duty on the part of the defendant state officials. *Edelman v. Jordan*, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). *See also Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct.

1139, 1143, 59 L.Ed.2d 358 (1979) ("[w]e rejected the notion that simply because the lower court's grant of retroactive benefits had been styled 'equitable restitution' it was permissible under the Eleventh Amendment").